**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**PUBLISHERS PRINTING COMPANY, INC., Respondent.**

No. 78–1069.

United States Court of Appeals, Sixth Circuit.

Argued April 7, 1980.

Decided July 10, 1980.

Elliott Moore, Deputy Associate Gen. Counsel, John G. Elligers, Frederick Havard, Linda Weisel, N. L. R. B., Washington, D. C., Emil Farkas, Director, Region 9, N. L. R. B., Cincinnati, Ohio, for petitioner.

John H. Doesburg, Phoenix, Ariz., for respondent.

Before EDWARDS, Chief Judge, BROWN, Circuit Judge and CECIL, Senior Circuit Judge.

CECIL, Senior Circuit Judge.

Petitioner, National Labor Relations Board, pursuant to Section 10(e) of the National Labor Relations Act, as amended, 29 U.S.C. Sec. 151, *et seq.*, applies for enforcement of its order to respondent, Publishers Printing Company, Inc., a Kentucky corporation, engaged in publishing magazines for commercial customers, to cease and desist from:

1. discharging or otherwise discriminating against employees to discourage membership in the Teamsters, Local Union 783, affiliated with International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America;

2. interrogating employees as to whether they signed union cards;

3. telling employees that the plant would be closed if the employees voted in a union;

4. telling employees that an employee had been fired for soliciting union cards;

5. enforcing any rule that there would be no solicitations of any kind for any purpose carried on among employees;

6. in any other manner discouraging membership in the union organization.

Further, the Board's order requires the respondent to take affirmative action as follows:

1. offer Carl Mattingly and William Phillips full reinstatement to their former positions;

2. make Mattingly and Phillips whole for any loss of earnings they may have suffered by reason of respondent's discrimination against them;

3. revoke its no solicitation rule.

The ultimate issues are:

Whether substantial evidence on the record as a whole supports the Board's findings that Respondent violated Sections 8(a)(1) and (3) of the Act.

The respondent argues that those persons allegedly responsible for the violative actions were not supervisors and therefore management could not be responsible for their acts. Our first consideration then, is whether the Board's determination that those persons were supervisors "has 'warrant in the record' and a reasonable basis in law." *N. L. R. B. v. Hearst Publications,* 322 U.S. 111, 131, 64 S.Ct. 851, 861, 88 L.Ed. 1170 (1944). Section 2(11) of the Act defines a supervisor as:

"any individual having the authority, in the interest of the employer, to hire, transfer, suspend, layoff, recall, promote, discharge, assign, reward or discipline other employees, or responsibly to direct them, or to adjust grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of merely routine or clerical nature, but requires the use of independent judgment."

The persons whose supervisory status is in question are: Paul Mattingly, Ronald Adams, Joe Gast and Orville Crigler.

With respect to Paul Mattingly, there is evidence in the form of testimony of em-

ployees Phillips and Summitt, to the effect that Mattingly assigned and directed the work of several employees in respondent's shipping and receiving department by telling them what to do. Summitt testified that Mattingly was his supervisor and assigned work for him to perform. According to Summitt, Mattingly "could suggest" the hire or fire of employees, and that "As far as I know, he recommended me" for hire. Summitt further testified that Mattingly assigned overtime, and that, if Summitt forgot to punch in or needed his time card corrected, Mattingly would correct it.

Mattingly, himself, testified that he did not have the authority to hire, fire, discipline, promote, demote, transfer or layoff any employee of respondent. · His testimony was to the effect that he was merely a conduit for instructions from plant superintendent Gearheart to other employees. According to Mattingly, he did not even have the authority to tell other employees what to do. Instead, Mattingly testified that "I don't tell them, I ask them to help me."

Mattingly described his responsibilities, however, as follows:

"I take care of anything that comes in anything that's received. Anything that's shipped out. I take care of the inserts for the customers * * *. I do about anything that has to do with the shipping and receiving."

It is concluded that such broad responsibilities described by Mattingly, himself, simply could not be carried out with the limited authority claimed by him, that is, that he was merely a conduit for the superintendent's instructions and could only ask and not require other employees who worked with him to help him. In view thereof, and in view of there being testimony to the effect that Mattingly could effectively recommend employees for hire, there is substantial evidence on the record supporting the Board's conclusion that Paul Mattingly was a supervisor within the meaning of Section 2(11) of the Act.

The evidence with respect to the supervisory status of Ronald Adams is much the same as Mattingly. Like Mattingly, Adams testified that he voted in the union election. He denied having any authority to hire, fire, promote or demote respondent's employees. The effect of Adams' testimony was that he merely channelled directions for work activity from superintendent Gearheart to other employees. Further, like Mattingly, Adams insisted upon testifying that he merely asked other employees in the department to "help" him "to get the work done."

Yet, Adams testified that he was responsible for stock paper control at respondent's plant and described the following broad responsibilities:

"Unloading boxcars with rolls of paper in them or tractors and trailers that got rolls of paper in them; cleaning up the dock area, moving paper in storage; getting paper out for presses; I've got a daily schedule and I go by this and deliver · paper to each press for each job and this schedule continues for the period of three shifts * * *."

Employee Phillips testified that Adams "was my foreman when I first started to work". Phillips testified that Adams was his instructor in "sweeping up floors, teaching me how to drive a tow motor, how to operate it, * * * my overtime that I should work, when I should work it, the hours I work on, things of that nature." Phillips further testified that plant superintendent Gearheart told him that Adams was Phillips' foreman when Gearheart hired Phillips.

While Gearheart testified that Adams was only a lead man and not a foreman, he did not contradict Phillips' testimony that he told Phillips that Adams was, in fact, Phillips' foreman. Further, Gearheart's testimony was to the effect that Adams had the same hiring authority as Paul Mattingly. In view thereof, and for the same reasons discussed above with respect to Mattingly, we conclude that there is substantial evidence on the record to support the Board's finding that Adams was a supervisor within the meaning of Section 2(11) of the Act.

Neither of the other two individuals—Orville Crigler or Joe Gast—whose supervi-

sory status is at issue, testified at the hearing before the administrative law judge. There is testimony on the record, however, to the effect that Crigler was a second shift bindery foreman, responsible for books being cut and fitting right, and for getting out production. This evidence, in the form of the testimony of employees Phillips and Masden, also supports the conclusion that Crigler gave orders to approximately six employees in carrying out these duties. In view thereof, and in view of the fact that Crigler did not testify, allowing the inference that his testimony would have been detrimental, we conclude that substantial evidence exists on the record to support the finding of the Board that Crigler was a supervisor.

Finally, with respect to the status of Joe Gast, employee Raley testified that Gast was his supervisor while he was employed as a butler operator. Raley described Gast as his supervisor based upon his being the foreman of the pressroom section, in which capacity Gast assigned work and checked on its quality. Raley testified that "I reckon he had the authority to hire and to fire." At any rate, Raley testified that he looked upon Gast as having that particular authority and that, in fact, "he hired me in." In view thereof, we conclude that there is substantial evidence on the record to support the Board's finding that Gast was also a supervisor within the meaning of Section 2(11) of the Act.

Having determined that Paul Mattingly, Ronald Adams, Joe Gast and Orville Crigler were in fact supervisors, there is ample evidence that they and other admitted supervisors committed the violations of 8(a)(1) and (3) of the Act as alleged in the order which the Board seeks to enforce.

Considering the affirmative orders in relation to the alleged discharges of Carl Mattingly and William Phillips, we conclude that there is substantial evidence in the record to support the Board's order for the full reinstatement of those employees and to make them whole for any loss suffered by them for respondent's discrimination against them.

■ With respect to Carl Mattingly, this substantial evidence consists of the testimony of employees Phillips and Summitt. They testified that Paul Mattingly told them that Carl Mattingly had been discharged because he had been soliciting union cards. Paul Mattingly did not deny this testimony, and, further, he did not deny employee Spurling's testimony that Paul Mattingly told Spurling that Carl Mattingly had been discharged because of his soliciting union cards. Finally, plant superintendent Gearheart testified that he thought Carl Mattingly had been discharged because of soliciting.

■ With respect to the discharge of William Phillips, respondent contends that the discharge was motivated by concern that Phillips' dual employment with General Electric and respondent would create a hazard on respondent's premises. The hearing testimony indicates, however, that respondent had knowingly tolerated Phillips' dual employment prior to Phillips' involvement in union activities. Further, respondent had allowed Phillips to work shorter hours in order for Phillips to work both at General Electric and at respondent's plant. In view thereof, and in view of Superintendent Gearheart's description of Phillips as a good worker, it is concluded that Phillips' dual employment was merely a pretext for discharging a union organizer. Accordingly, there is substantial evidence on the record to support the Board's finding that Phillips was discharged in violation of Section 8(a)(1) and (3) of the Act.

■ Finally, there is the order to require the respondent to revoke its no solicitation rule.[1] This was a rule adopted during the union campaign against any employee solicitation in the plant for any purpose at any time. There were solicitations for various things by a number of employees prior to the adoption of this rule. Since this exclusive rule was adopted by management dur-

---

1. In the interest of order, cleanliness and efficient production, there shall be *no solicitations of any kind* for any purpose carried on among the employees in the plant. (Emphasis in original.)

ing the union campaign, it is obvious that it was directed at the union card solicitation. It was therefore a violation of Section 8(a)(1).

The order of the Board is enforced as to all of its parts.