692 F.2d 1115
 111 L.R.R.M. (BNA) 3021, 95 Lab.Cas. P 13,864
 MONTGOMERY WARD & COMPANY, INC., Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
Warehouse, Mail Order, Office, Technical and Professional
Employees Local 743, International Brotherhood of
Teamsters, Chauffeurs, Warehousemen and
Helpers of America,
Intervening-Respondents.
 No. 81-2501.
 United States Court of Appeals,
Seventh Circuit.
 Argued June 10, 1982.
Decided Nov. 10, 1982.
 
 Alexandra M. Goddard, Montgomery Ward & Co., Inc., Chicago, Ill., for petitioner.
 Kenneth Hipp, Deputy Asst. Counsel, Elliott Moore, N.L.R.B., Washington, D.C., for respondent.
 Before CUMMINGS, Chief Circuit Judge, CUDAHY, Circuit Judge, and EAST, Senior District Judge.*
 CUDAHY, Circuit Judge.
 
 
 1
 Whether employers may prohibit nonemployee union organizers from entering their property to discuss unionization with employees is a highly sensitive question. It arises from the inherent tension between the self-organization rights of employees and the property rights of employers. In the case before us, the National Labor Relations Board (the "Board") determined that an employer's no-solicitation rule, even when applied in a nondiscriminatory manner to prohibit nonemployee union organizers from meeting with off-duty employees in a cafeteria-style department store restaurant, violated section 8(a)(1) of the National Labor Relations Act (the "Act"), 29 U.S.C. Sec. 158(a)(1) (1976). The employer and petitioner, Montgomery Ward & Co., Inc. ("Montgomery Ward"), supported by the American Retail Federation as amicus curiae, seeks our review of the Board's order. The Board, supported by the intervening Local 743, Warehouse, Mail Order, Office, Technical and Professional Employees, Teamsters Union (the "Union"), has filed a cross-application for enforcement of its order. We grant enforcement of the Board's order, but carefully limit our decision to the facts which we set forth below.
 
 I.
 
 2
 The facts are, for the most part, undisputed. They are set out in considerable detail in the decisions of the Board and the Administrative Law Judge ("ALJ"), reported at 256 N.L.R.B. No. 134 (1981). Montgomery Ward operates a two-level department store in the Yorktown Shopping Center, a large, enclosed shopping mall in Lombard, Illinois. Retail sales facilities open to the public, including a "Buffeteria," are located on the upper level; the lower level contains, in addition to retail sales facilities, two credit service centers and a credit operating center (the "credit center" or "credit centers"). The credit centers are not open to the public as are the retail sales facilities, although there is a conference area adjacent to the centers where customers may discuss their credit accounts with center employees.
 
 
 3
 After receiving an inquiry from a credit center employee, the Union began its organizational efforts among the credit center employees in November 1977. By letter dated November 12, 1977, the Union informed Leonard Hunlock, manager of the credit center, of the organizational drive. Several days later, union organizers Regina Polk and John Garcia met after work with several employees of the credit center in a restaurant adjacent to the shopping mall. In response to a request by the employees, Polk and Garcia agreed to have lunch with a group of credit center employees at noon on December 2, 1977, in the Montgomery Ward Buffeteria while the employees were on their one-half hour lunch breaks.
 
 
 4
 On the morning of December 2, Polk and Garcia stood on the sidewalk (owned by Montgomery Ward) in front of the store and distributed union literature. Reed Harvey and Douglas Ruhl, the personnel and operating managers, respectively, of the credit center observed Polk and Garcia distributing literature. Hearing "through the grapevine" that the Union organizers would meet several credit center employees in the Buffeteria at lunch, Harvey and Ruhl also arranged to eat their lunch in the Buffeteria so that they could monitor the organizers' actions.
 
 
 5
 The Buffeteria where the organizers and employees planned to meet is a cafeteria-style restaurant, operated by Montgomery Ward as part of a separate food service department. Customers select food and beverages from a self-service display area, place the items on a tray and pay for their purchases at cash register stations; there are no waiters, waitresses or table service, and there is no counter where customers may sit and eat. Movable tables, which seat two persons each, are arranged in groups of two to four and are available for use by customers to eat in the Buffeteria.[1] Aisles three to three and one-half feet wide separate the groups of tables from one another. Customers may enter the Buffeteria either directly from the mall or from the Montgomery Ward parking lot; there is no access to the Buffeteria directly from the Montgomery Ward retail store area. Employees of Montgomery Ward may eat in the Buffeteria, and they are treated in the same way as other customers, receiving no special discounts.[2] In fact, ten to twenty percent of the sales volume in Montgomery Ward's Yorktown Buffeteria is attributable to Montgomery Ward employees.[3]
 
 
 6
 Union organizers Polk and Garcia entered the Buffeteria at noon on December 2, and, upon seeing that the credit center employees they planned to meet were already seated at tables eating their lunches, went directly to a table adjacent to the employees. The Buffeteria was about half full at this time, and the patrons nearest the organizer-employee group were seated about fifteen feet away. The organizers chatted briefly with the employees and, upon request by an employee, distributed union authorization cards. Harvey and Ruhl, who had been standing in the self-service line, observed Polk and Garcia enter the Buffeteria and sit down with the credit center employees. Harvey and Ruhl immediately approached the organizer-employee group and asked to speak to the organizers.
 
 
 7
 Harvey, Ruhl and the union organizers then left that Buffeteria and went into an aisle in the store area (but still within sight of the credit center employees who remained seated at their table). After exchanging introductions, Harvey told the organizers that they were trespassing on Montgomery Ward property and violating company policy by soliciting employees; Harvey told the organizers that if they did not leave, he would ask the police to remove them. Polk and Garcia stated that they would not leave because they thought Harvey's request violated the employees' rights, and they returned to the table where they had been sitting. After discussing the incident with the organizers, the employees left; and Polk and Garcia purchased some food at the self-service counter and returned to the table they had occupied before. In the meantime, Harvey called the police.
 
 
 8
 After two uniformed police officers arrived, Harvey and Ruhl, accompanied by the police officers, sat down at the union organizers' table. Harvey told the organizers that they could finish eating their lunches but, if they spoke to any employees or refused to leave after eating, he would sign a complaint against them and have them removed. The policemen took the organizers' names and addresses, and then left; Harvey and Ruhl remained seated at a table next to the organizers, watching them finish their lunches. About ten minutes later, the organizers left the Buffeteria, accompanied by Harvey, Ruhl and a plainclothes security guard. The Union filed this unfair labor practices charge five days later on December 7, 1977.
 
 
 9
 The Union's efforts at contacting the employees after the Buffeteria incident were not very successful. When the organizers distributed union literature on the sidewalks next to the store, Montgomery Ward called the police to remove them on at least two occasions.[4] The Union was also unsuccessful in gathering information about the credit center workforce. Employees sympathetic to the Union were unable to secure a complete list of credit center employees. Further, the Union was unable accurately to identify (by license number) cars belonging to credit center employees after Montgomery Ward told the credit center employees to park in a new area where their cars were interspersed with automobiles belonging to other employees and customers.
 
 
 10
 The General Counsel argued before the ALJ that Montgomery Ward's discriminatory enforcement of the no-solicitation rule in the Buffeteria, together with its actions in calling the police to remove the union organizers and in conducting surveillance of the organizers while they were in the Buffeteria, violated section 8(a)(1) of the Act. The ALJ agreed that Montgomery Ward's enforcement of the no-solicitation rule, assuming that it was facially valid, was unlawful because "a purpose of [Montgomery Ward's] rule against solicitation by non-employees was to discriminate against 'solicitation' of non-Buffeteria employees by union organizers where, as here, such 'solicitation' was part of an orderly, discreet conversation by appointment with willing employee patrons over tables where they were eating during their unpaid lunch periods." 256 N.L.R.B. No. 134, ALJ's decision at 19. The ALJ also concluded that Montgomery Ward's surveillance of the organizers and resort to the police constituted independent violations of section 8(a)(1). But the ALJ refused to rule on the "essentially theoretical question" whether Montgomery Ward could lawfully enforce a no-solicitation rule, even if enforced in a nondiscriminatory manner, to the extent of forbidding nonemployee union organizers from meeting with off-duty employees in the Buffeteria.
 
 
 11
 The Board, while approving and adopting the ALJ's decision, went one step further and addressed the "theoretical question" involving the facial validity of Montgomery Ward's no-solicitation rule as applied to the Buffeteria. Relying on its decision in Marshall Field & Co., 98 N.L.R.B. 88, modified on other grounds and enforced, 200 F.2d 375 (7th Cir.1952), the Board agreed with the contention of the General Counsel and the Union "that even a nondiscriminatory no-solicitation rule ...[,] applied in a manner to prohibit nonemployee union organizers from meeting with off-duty employees in a department store restaurant, [when] they conduct themselves in a manner consistent with the purpose of the restaurant," was unlawfully broad. 256 N.L.R.B. No. 134 at 2. Montgomery Ward's petition for review and the Board's cross-application for enforcement followed.II.
 
 
 12
 It is important to note that the case at hand involves two sets of rights which are analytically separable and which have resulted in two strands of legal doctrine: the rights of nonemployee union organizers to gain access to an employer's premises in order to solicit employees and the rights of the employees themselves to solicit and be solicited when they are off duty. The standard governing the access of nonemployees who wish to distribute union literature or solicit on behalf of a union was described by the Supreme Court in NLRB v. Babcock & Wilcox Co., 351 U.S. 105, 112, 76 S.Ct. 679, 684, 100 L.Ed. 975 (1956):
 
 
 13
 It is our judgment ... that an employer may validly post his property against nonemployee distribution of union literature if reasonable efforts by the union through other available channels of communication will enable it to reach the employees with its message and if the employer's notice or order does not discriminate against the union by allowing other distribution.... But when the inaccessibility of employees makes ineffective the reasonable attempts by nonemployees to communicate with them through the usual channels, the right to exclude from property has been required to yield to the extent needed to permit communication....[5]
 
 
 14
 To analyze the circumstances of this case, however, the Babcock & Wilcox "access rule" must be supplemented by the set of legal standards developed by both the NLRB and the Supreme Court to govern "no-solicitation" rules, i.e., rules governing the right of an employer to proscribe, in general, the solicitation of his employees. Both the Supreme Court and the Board have long recognized "that the right of employees to self-organize and bargain collectively established by Sec. 7 of the [Act], necessarily encompasses the right effectively to communicate with one another regarding self-organization at the jobsite." Beth Israel Hospital v. NLRB, 437 U.S. 483, 491, 98 S.Ct. 2463, 2468, 57 L.Ed.2d 370 (1978) (footnote omitted); accord Central Hardware Co. v. NLRB, 407 U.S. 539, 542-43, 92 S.Ct. 2238, 2240-41, 33 L.Ed.2d 122 (1972). But the right to effective communication at the jobsite may conflict with the undisputed rights of employers to direct their workforce and to control access to their property. See Republic Aviation Corp. v. NLRB, 324 U.S. 793, 797-98, 65 S.Ct. 982, 985, 89 L.Ed. 1372 (1945). Solicitation of employees for union membership at the jobsite and access of union organizers to a jobsite for the purpose of soliciting union membership are two subjects upon which the Court has directed the Board to establish standards which accommodate the respective interests of employees and employers "with as little destruction of one as is consistent with the maintenance of the other." NLRB v. Babcock & Wilcox Co., 351 U.S. 105, 112, 76 S.Ct. 679, 684, 100 L.Ed. 975 (1956).
 
 
 15
 In striking this balance, the Court has directed that an employer's rule prohibiting union solicitation by employees on the employer's property during nonworking hours is to be considered presumptively invalid, although a rule prohibiting solicitation during working hours is presumptively valid. Republic Aviation Corp. v. NLRB, 324 U.S. 793, 803 & n. 10, 65 S.Ct. 982, 988 & n. 10, 89 L.Ed. 1372 (1945), approving the doctrine expressed by the Board in Peyton Packing Co., 49 N.L.R.B. 828, 843-44 (1943), enforced, 142 F.2d 1009 (5th Cir.), cert. denied, 323 U.S. 730, 65 S.Ct. 66, 89 L.Ed. 585 (1944).[6] As an exception to this general presumption, however, the Board has approved rules prohibiting union solicitation in the "selling areas" of restaurants and stores even during nonworking hours, reasoning that such solicitation, if disruptive, would unreasonably interfere with the employer's business of serving customers. See, e.g., May Department Stores Co., 59 N.L.R.B. 976 (1944), enforced as modified, 154 F.2d 533 (8th Cir.), cert. denied, 329 U.S. 725, 67 S.Ct. 72, 91 L.Ed. 627 (1946); McDonald's Corp., 205 N.L.R.B. 404 (1973).
 
 
 16
 Although in most cases the Board and the courts can rely on this exception for selling areas to determine the validity of a no-solicitation rule applied to employees in restaurants on their off-duty time, "the fact that an establishment is a restaurant or a store does not automatically allow [the employer] to impose a broad no-solicitation rule." NLRB v. Silver Spur Casino, 623 F.2d 571, 582 (9th Cir.1980), cert. denied, 451 U.S. 906, 101 S.Ct. 1973, 68 L.Ed.2d 294 (1981), reh'g denied, 452 U.S. 931, 101 S.Ct. 3068, 69 L.Ed.2d 432 (1981). In each case, the Board in the first instance must strike "the appropriate balance between organizational and employer rights in the particular industry to which each [no-solicitation rule] is applicable," and we shall defer to the Board's balancing if it is supported by substantial evidence. Beth Israel Hospital v. NLRB, 437 U.S. 483, 506, 98 S.Ct. 2463, 2476, 57 L.Ed.2d 370 (1978) (emphasis in original); see id. at 504, 506, 98 S.Ct. at 2475, 2476. The general standards developed by the Board and the courts thus do not purport to be universally dispositive of every case but frequently serve only as guidelines which help to determine whether on balance the policies of the Act should give way to property or other interests.
 
 III.
 
 17
 Claims involving no-solicitation rules generally arise in one of two circumstances: (1) an employer may violate section 8(a)(1) by discriminatorily adopting or enforcing an otherwise valid no-solicitation rule, or (2) absent discriminatory enforcement, an employer may violate section 8(a)(1) by maintaining and applying a facially invalid no-solicitation rule. See, e.g., Midwest Stock Exchange, Inc. v. NLRB, 635 F.2d 1255 (7th Cir.1980) (discriminatory enforcement of otherwise valid no-solicitation rule); NLRB v. Roney Plaza Apartments, 597 F.2d 1046 (5th Cir.1979) (even if applied nondiscriminatorily, no-solicitation rule was overbroad and invalid); NLRB v. Gale Products, Division of Outboard Marine Corp., 337 F.2d 390 (7th Cir.1964) (no-solicitation rule was facially valid and impartially applied).[7] In the case before us, the ALJ found, and the Board agreed, that Montgomery Ward discriminatorily enforced its rule, thus violating section 8(a)(1). Having based her conclusion on the existence of discrimination, the ALJ declined to rule on the "theoretical" question whether Montgomery Ward could maintain and enforce the rule even in a nondiscriminatory manner. The Board, however, considered this "theoretical" question and concluded that the rule was facially invalid even if applied nondiscriminatorily to prohibit nonemployee organizers from meeting with off-duty employees in the Buffeteria. Thus, we must consider Montgomery Ward's no-solicitation rule under theories of liability which involve discrimination as well as theories which do not.
 
 
 18
 Two questions are thus presented for our review: (1) assuming that Montgomery Ward's no-solicitation rule may be validly applied to nonemployees who solicit off-duty employees in the Buffeteria, is there substantial evidence in the record to support the ALJ's conclusion (adopted by the Board) that Montgomery Ward discriminatorily enforced its rule in violation of the Babcock & Wilcox standard; and (2) is there substantial evidence in the whole record to support the Board's conclusion, based upon a balancing of employee and employer interests, that Montgomery Ward may not prohibit solicitation of off-duty employees by nonemployees in the Buffeteria even in the absence of discriminatory enforcement?
 
 A.
 
 19
 As to the first issue, we believe that substantial evidence supports the finding that Montgomery Ward discriminatorily enforced its no-solicitation rule in a manner that coerced, restrained and interfered with the exercise of protected rights. Montgomery Ward's no-solicitation rule proscribes any form of solicitation while the employees are on "Company time," and it forbids solicitation by nonemployees on Company property at all times.[8] The context in which that broad rule was enforced here suggests, without more, that its application was almost necessarily discriminatory. Thus the facts before us involve an essentially private conversation in a restaurant open to the public, between off-duty employees and organizers who have come to the restaurant at the request of the employees. It is difficult, if not impossible, to envisage how a no-solicitation rule as broad as Montgomery Ward's could be applied to such a situation in a non-discriminatory manner. In the case at hand, the employer's representatives approached the seated group only because they knew in advance that Polk and Garcia were union organizers. In other situations most customers would obviously find it offensive for Montgomery Ward to monitor their conversations to guard against solicitation in a wide variety of circumstances not involving labor organization. Yet such monitoring appears to be the only way Montgomery Ward could effectively and nondiscriminatorily enforce the rule in the Buffeteria. If a solicitation took place discreetly in the course of a luncheon conversation, we very much doubt that Montgomery Ward would risk the sort of customer disruption which took place in this case, where police were called to remove two Buffeteria patrons from the premises, in order to enforce the no-solicitation rule against solicitation not involving labor organization.
 
 
 20
 Indeed, the testimony of the employer's representatives, Harvey and Ruhl, indicated (and the ALJ found) that the rule here was enforced against these union organizers only because they solicited for union membership. According to Harvey, he approached the table where the union organizers were seated because he "assumed they were there for union solicitation"; but he further testified that he had never approached any other group in the Buffeteria in a similar attempt to enforce the no-solicitation rule. Although Montgomery Ward officials claimed that the purpose of the no-solicitation rule was to prevent customer disruption and interference, both Harvey's and Ruhl's testimony indicates that they enforced the rule on December 2 not to halt any imminent threat to customer convenience but only because, as Harvey stated, "soliciting for union membership was contrary to company policy." Cf. Marshall Field & Co. v. NLRB, 200 F.2d 375, 382 (7th Cir.1952) (approving employer's banning of solicitors from selling areas when they acted in "loud and rowdy" manner).
 
 
 21
 Moreover, there was other evidence which demonstrates that Montgomery Ward disparately enforced this rule against the Union. Although the no-solicitation rule was ostensibly in effect on December 2, 1977, the ALJ found that Montgomery Ward did not post the rule until several days after the incident in the Buffeteria. This failure to post the rule suggests that Montgomery Ward's purpose was to interfere with organizational activity. See NLRB v. Montgomery Ward & Co., 554 F.2d 996, 1000 (10th Cir. 1977). There is further evidence of discrimination in the testimony of Montgomery Ward officials who, in the words of the ALJ, indicated that when enforcing the rule in the Buffeteria, "the scope of the ban on solicitation of employees depends partly on the kind of organization being solicited for." 256 N.L.R.B. at 17 (ALJ's opinion). For example, Harvey testified that he was unsure whether he would prohibit solicitation in the Buffeteria on behalf of the Girl Scouts or the American Bar Association, but on December 2 he demonstrated no hesitancy when union solicitation was involved. Moreover, Montgomery Ward actually tolerated solicitation in violation of the rule, as exemplified by the activities of employee Simmons, who admitted soliciting fellow employees on work time to buy cosmetics and jewelry. See Midwest Stock Exchange, Inc. v. NLRB, 635 F.2d 1255 (7th Cir.1980). In addition, union organizers were expelled from Montgomery Ward property (and in one instance arrested) after December 2 when they distributed union literature on a private sidewalk outside the store area, even though Montgomery Ward's no-solicitation rule apparently allows solicitation there.[9] In sum, there is substantial evidence to support the finding that Montgomery Ward discriminatorily enforced its no-solicitation rule to bar access to these nonemployee union organizers in violation of section 8(a)(1). See Babcock & Wilcox, 357 U.S. at 112, 76 S.Ct. at 684. Although some of this evidence may be simply the product of the inherent difficulty of monitoring private conversations in the Buffeteria, we think this difficulty ought properly to be considered in deciding whether the rule was (or could be) enforced in a nondiscriminatory manner.
 
 B.
 
 22
 Having found that Montgomery Ward's no-solicitation rule was discriminatorily applied in this case, we turn now to the question whether the solicitation which occurred could lawfully be prohibited, even in the absence of discrimination. It is our conclusion that substantial evidence supports the Board's finding that Montgomery Ward may not enforce its no-solicitation rule in the Buffeteria under the circumstances of this case and thus that the rule is unlawfully over-broad insofar as it prohibits the organizational activities which occurred here.
 
 
 23
 In reaching this conclusion, we have attempted to face squarely the crucial question of the applicability of Babcock & Wilcox to the circumstances before us. The Board argues that Babcock & Wilcox is not controlling here, since the property involved was open to the public. Montgomery Ward argues, on the other hand, not only that Babcock & Wilcox applies, but also that the "test" or "standard" prescribed in that case prohibits the Board from taking account of the balance of interests absent a preliminary finding that employees are inaccessible to organizational communication by other means. In order to resolve this basic controversy as to the proper standard governing the facts before us, we must examine Babcock & Wilcox in depth.
 
 
 24
 Babcock & Wilcox involved the distribution of literature by nonemployee union organizers in the parking lot of a factory in the early 1950s. The factory was located one mile from a town of 21,000 people, where 40% of the 500 employees lived; the rest of the employees lived within a 30-mile radius. 351 U.S. at 106, 76 S.Ct. at 681. In holding that the parking-lot distribution could be prohibited in the absence of discrimination or of a showing that union access to the employees was otherwise impossible, the Court emphasized that "[t]he plants are close to small well-settled communities were a large percentage of the employees live." Id. at 113, 76 S.Ct. at 684. The heart of the Babcock & Wilcox analysis was the Court's conclusion that the competing interests found in the particular context must be balanced:
 
 
 25
 This is not a problem of always open or always closed doors for union organization on company property. Organization rights are granted to workers by the same authority, the National Government, that preserves property rights. Accommodation between the two must be obtained with as little destruction of one as is consistent with the maintenance of the other.
 
 
 26
 Id. at 112, 76 S.Ct. at 684. The determination of the proper adjustment of interests, said the Court, rests with the Board; but the Board had erroneously used the standard applicable to solicitation by employees in a situation involving access to the employer's property by nonemployees. Id. at 113, 76 S.Ct. at 684. The Board had thus failed to make an important factual distinction central to the proper balance of interests in Babcock & Wilcox.
 
 
 27
 Babcock & Wilcox has been described as imposing a two-prong test: there must be a showing either of discrimination or of difficulty of alternative union access. But we believe the Babcock & Wilcox standard cannot be oversimplified and must always involve a process of balancing or accommodating of interests in circumstances where nonemployee access is the issue. The two prongs relevant on the Babcock & Wilcox facts really incorporate such a balancing. If, on the one hand, a no-solicitation rule is enforced in a discriminatory fashion, that fact goes to the weight of the employer's interest: if non-union solicitation is permitted, does the employer really care about the impact of this activity itself upon his property or managerial rights? On the other hand, in a situation where employees are not reasonably accessible by alternative means to union organizational efforts, the weight to be placed on their organizational rights and interests grows heavier; and the employer's property interest must then yield to this very much heightened significance of the organizational interests implicated.
 
 
 28
 The approach mandated by Babcock & Wilcox cannot, by its very nature, be applied in a mechanistic fashion. The two-prong "rule" which emerged from that approach in the Babcock & Wilcox case had a precise "fit" in a factory situation in a small community in the 1950s. But the same "rule," woodenly applied, does not necessarily fit the circumstances of a workplace open to the public in a shopping center in a major metropolitan area in the 1980s. Yet the apparent lack of fit does not mean that Babcock & Wilcox does not "apply" to the circumstances of the case before us. Babcock & Wilcox must be an important starting point for analysis of any solicitation activity by nonemployees. The rationale of Babcock & Wilcox controls such activities even when the facts are as distinguishable as those found here, but these distinct circumstances profoundly affect the balance of the interests served.
 
 
 29
 We must, therefore, reject both the Board's contention that Babcock & Wilcox does not apply where access to the employer's premises is open to the public and Montgomery Ward's argument that the Board may not undertake to balance interests unless there is a preliminary finding of inaccessibility to the union. Both those circumstances--public access to the premises and difficulty of access by the union to the employees--are significant to the balance of property and organizational interests; but there must still be a balancing--or accommodation--in order to reach a just and workable result. And it is important to remember that the standard ultimately being applied is that of the National Labor Relations Act, which Babcock & Wilcox articulates but cannot easily and precisely define for all places and all times.
 
 
 30
 The Supreme Court's post-Babcock & Wilcox cases involving union solicitation indicate that our approach to Babcock & Wilcox is correct. Thus, in Hudgens v. NLRB, 424 U.S. 507, 540, 96 S.Ct. 1029, 1046, 47 L.Ed.2d 196 (1976), the Court reiterated that the accommodation of Sec. 7 rights and property rights was the core of Babcock & Wilcox, as, indeed, of the National Labor Relations Act itself, and that the proper accommodation of the two rights depended in each instance upon the context and the organizational activity involved:
 
 
 31
 The Babcock & Wilcox opinion established the basic objective under the Act: accommodation of Sec. 7 rights and private property rights "with as little destruction of one as is consistent with the maintenance of the other." The locus of that accommodation, however, may fall at differing points along the spectrum depending on the nature and strength of the respective Sec. 7 rights and private property rights asserted in any given context. In each generic situation, the primary responsibility for making this accommodation must rest with the Board in the first instance.
 
 
 32
 424 U.S. at 522, 96 S.Ct. at 1037 (citations omitted).[10]
 
 
 33
 The Beth Israel case presents an example of the sensitive attention which the Supreme Court reserves for the particular context of a case involving solicitation activity. Beth Israel Hospital v. NLRB, 437 U.S. 483, 98 S.Ct. 2463, 57 L.Ed.2d 370 (1978). Although nonemployees were not involved, the Court regarded as central to the balance struck under the Act that the context was a hospital and that patients were present in the cafeteria where solicitation and distribution occurred. Nonetheless, the Court invalidated the hospital's no-solicitation rule as applied to the cafeteria, emphasizing again that it was the Board's task to evaluate the relative strength of the interests involved and to balance them. 437 U.S. at 503, 98 S.Ct. at 2474.
 
 
 34
 In the case at hand, the Board considered the various interests involved and mandated an accommodation which would allow solicitation by nonemployees in the Buffeteria when such organizational activity was carried on in a nondisruptive fashion consistent with the normal use of the restaurant. Our task is limited to reviewing whether the record contains substantial evidence to support those findings. Beth Israel Hospital v. NLRB, 437 U.S. at 507, 98 S.Ct. at 2476, citing Universal Camera Corp. v. NLRB, 340 U.S. 474, 491, 71 S.Ct. 456, 466, 95 L.Ed. 456 (1951). We conclude that it does.
 
 
 35
 On the one hand, the weight of the employees' interest here is substantially increased by the fact that there are major obstacles to access to them by union organizers.[11] The setting is a large shopping mall surrounded by highways. Presumably it would be difficult to follow the employees to their homes. The employees usually eat on the premises and have only a one-half hour break for lunch; the nearest restaurant facilities are a ten minute walk. The union was not given a list of the names of credit center employees and could not identify their cars in the parking lot.
 
 
 36
 On the other hand, the employer's legitimate property interests, in the circumstances of this case, are minimally implicated. The union organizers became "trespassers" not because of anything about their activities inconsistent with normal use of the Buffeteria but because Montgomery Ward managers discovered their identity, intervened in their conversations and invoked the no-solicitation rule. The organizers presumably would be invitees rather than trespassers to the extent that they merely entered the Buffeteria to have lunch with acquaintances.[12] Thus the employer's interests are almost exclusively managerial: the prevention of disruption of business and of inconvenience to customers or to other employees. And under the circumstances here, it does not seem that these interests were affected at all. The organizers and employees were in no way distinguishable from other members of the general public. Their conduct was consistent with that of the other Buffeteria patrons. They conversed in voices inaudible to the other patrons; they did not attempt to talk with anyone outside the planned luncheon group, did not distribute literature and did not move among the tables. The Buffeteria was only about half full at the time, so the union organizers did not tie up tables which might otherwise have been available to conduct a larger volume of business. There is no evidence that the solicitation in any way interfered with the ordinary functioning of the Buffeteria or with customer relations. Indeed, the only disruption involved was the consequence of the enforcement of the no-solicitation rule--the calling of police into the restaurant.
 
 
 37
 In short, there is substantial evidence to support the Board's conclusion that Montgomery Ward's no-solicitation rule cast its net too wide when it prohibited solicitation of off-duty employees in a restaurant open to the public--albeit on the employer's premises--when that restaurant was being used nondisruptively and in a manner consistent with its normal use.
 
 
 38
 The Board's conclusion here follows from its prior decision in Marshall Field & Co., 98 N.L.R.B. 88, 93-94, modified on other grounds and enforced, 200 F.2d 375 (7th Cir.1952). In Marshall Field the Board also rejected an employer's argument that it could lawfully prohibit all solicitation in its public restaurant, even if the solicited employees were off duty, explaining that:
 
 
 39
 While it is true that sales of merchandise, in this case food, are made to customers in the restaurants, the situation with regard to store restaurants is otherwise markedly different from that existing in the admittedly selling portions of the store. Customers patronizing the restaurants, for the most part, are placed at separate tables and are served by restaurant employees who are not, and who have not been, the subject of solicitation by the charging Union. The comparative isolation of customers from each other, coupled with the fact that no solicitation is carried on among employees on duty in the restaurants, make remote the possibility of substantial interference with the [employer's] business by solicitation of off-duty employees.
 
 
 40
 98 N.L.R.B. at 94 (footnote omitted). In Marshall Field the Board went on to find that the employer could lawfully impose limited restrictions "designed to insure that solicitation is carried on in the public restaurants only as an incident to normal use of such facilities." 98 N.L.R.B. at 94 (emphasis supplied). The restrictions approved by the Board in that case (which were the restrictions actually enforced by the employer) allowed nonemployee union organizers to meet with off-duty employees only by appointment in the restaurant; prevented organizers from moving from table to table when soliciting; and required that any solicitation be carried out discreetly.
 
 
 41
 Marshall Field is almost on all fours with the case before us. As in the public restaurant in Marshall Field, the patrons of the Buffeteria sit at small groups of tables, which are separated from one another. Moreover, the off-duty employees being solicited here, as in Marshall Field, do not work in the Buffeteria.[13] Indeed, the one apparent difference between the Buffeteria and the restaurants in Marshall Field--the lack of table service in the Buffeteria--suggests to us that the Buffeteria offers even less chance of disruption since in the Buffeteria union organizers could have only minimal contact with on-duty employees.
 
 
 42
 Montgomery Ward argues that the Board's decision in the case at hand is somehow invalidated by its reliance on the Marshall Field case, which predated Babcock & Wilcox. For a number of reasons, we find no merit in this argument. First, the argument is tied to a restrictive interpretation of Babcock & Wilcox which we have, as indicated, rejected. Without the restrictive gloss that difficulty of alternative means of access by the union is a prerequisite to lawful solicitation, Marshall Field can be seen as a case in which the Board balanced competing interests in a manner similar to the Supreme Court in Babcock & Wilcox. It is also noteworthy that the Board has in several more recent decisions invalidated no-solicitation rules applied to off-duty employees in restaurants.[14] In 1966, the Board struck down Montgomery Ward's earlier unwritten no-solicitation rule as overbroad in an incident at another location involving a meeting between an employee after work and a union representative in the store restaurant, rejecting the argument that the restaurant was a public sales area, since the two men "were as much entitled under the circumstances at the time to patronize the restaurant as any other members of the general public." Montgomery Ward, 162 N.L.R.B. 369 (1966).
 
 
 43
 In short, the Board has carefully considered and balanced the relevant competing interests in this case; and we will not disturb its conclusion that the no-solicitation rule is invalid as applied to off-duty employees meeting nonemployees in the Buffeteria. Although a ban on solicitation in restaurants may amount to an appropriate assertion of property or management rights in restaurants where customer convenience may be compromised if disruptive union solicitation is allowed, the facts in the case before us do not justify such a ban. The usual and usually justifiable concerns surrounding solicitation in public areas open to customers--disruption of the business and inconvenience to customers--simply are unjustified here. There is no danger that entirely private and unobtrusive solicitation such as that which occurred in this case will interfere with Montgomery Ward's business of serving customers.
 
 
 44
 The very circumstances which make it impossible for Montgomery Ward to enforce its rule in the Buffeteria in a nondiscriminatory manner--the inability to detect discreet solicitation over lunch--make it inappropriate to enforce such a rule, even if considered nondiscriminatory. There is virtually no burden on any property right or managerial right to be balanced against the heavy burden on the organizational rights of these almost inaccessible employees. The facts here fully support enforcement of the Board's order.
 
 IV.
 
 45
 Montgomery Ward also argues that the Board erred in concluding that it had violated section 8(a)(1) by undertaking surveillance of the nonemployee organizers and by threatening police action to remove the organizers. We agree with the Board, however, that Montgomery Ward's interruption of the organizer-employee meeting, followed by continued surveillance of the organizers, might reasonably tend to inhibit the exercise by credit center employees of their protected rights. See Midwest Stock Exchange, Inc. v. NLRB, 635 F.2d 1255, 1268 (7th Cir.1980); NLRB v. Intertherm, Inc., 596 F.2d 267 (8th Cir.1979). Although an employer may in some cases keep a union organizer under observation to insure there is no disruption of its business, Montgomery Ward went far beyond allowable scrutiny of activities on its premises by interfering with organizers who were meeting with off-duty personnel in a nondisruptive fashion and by engaging in unreasonably close "observation" of these organizers as they finished their lunches. Moreover, since the organizers, as we have found, were lawfully on the premises engaging in protected activities with employees, Montgomery Ward's threat of police action reasonably tended to interfere with the employees' exercise of section 7 rights, in violation of section 8(a)(1). See generally First Lakewood Associates v. NLRB, 582 F.2d 416 (7th Cir.1978).
 
 V.
 
 46
 We conclude that Montgomery Ward violated section 8(a)(1) by promulgating and discriminatorily enforcing a no-solicitation rule which barred nonemployee union organizers from meeting with off-duty credit center employees in the Buffeteria, and further violated section 8(a)(1) by threatening police action and engaging in unwarranted surveillance of protected activities. We grant enforcement of the Board's order and dismiss the petition for review.
 
 ENFORCEMENT GRANTED
 
 
 *
 The Honorable William G. East, Senior District Judge for the District of Oregon, is sitting by designation
 
 
 [1]
 The total seating capacity of the Buffeteria is 170
 
 
 [2]
 The only eating-room facility available to the credit center employees on Montgomery Ward premises is the Buffeteria, although on weekends during the Christmas season another room is made available for employees eating brown-bag lunches. Moreover, the Buffeteria is the only source of ready-to-eat food in the Montgomery Ward store other than several vending machines. Several other restaurants and eating facilities are located in other stores within the mall, the closest being a ten minute walk for the credit center employees. Credit center employees testified that, because of their short lunch break, they usually did not eat lunch at facilities outside Montgomery Ward premises
 
 
 [3]
 Sales volume at the Yorktown Buffeteria in 1977 was $170,000.00
 
 
 [4]
 The Union and Montgomery Ward also exchanged letters in which Montgomery Ward refused to grant the Union's request for access to its premises and for a list of credit center employees. Montgomery Ward also rejected the Union's assertion that enforcement of the no-solicitation policy violated federal labor laws
 
 
 [5]
 Although Babcock & Wilcox dealt with distribution of union literature, the Court has applied this rule in solicitation cases as well. See Central Hardware Co. v. NLRB, 407 U.S. 539, 92 S.Ct. 2238, 33 L.Ed.2d 122 (1972)
 
 
 [6]
 Working time is for work. It is therefore within the province of an employer to promulgate and enforce a rule prohibiting union solicitation during working hours.... It is no less true that time outside working hours, whether before or after work, or during luncheon or rest periods, is an employee's time to use as he wishes without unreasonable restraint, although the employee is on company property. It is therefore not within the province of an employer to promulgate and enforce a rule prohibiting union solicitation by an employee outside of working hours, although on company property
 Peyton Packing Co., 49 N.L.R.B. at 843-44.
 
 
 [7]
 Although a section 8(a)(1) violation is usually established by proof that an employer's actions might reasonably tend to coerce, restrain or interfere with the exercise of protected rights by employees, see NLRB v. Berger Transfer & Storage Co., 678 F.2d 679, 689 (7th Cir.1982), courts have usually required that there be some evidence of discrimination in the enforcement of a no-solicitation rule before such enforcement will be held to violate section 8(a)(1). See, e.g., NLRB v. Babcock & Wilcox, 351 U.S. 105, 112, 76 S.Ct. 679, 684, 100 L.Ed. 975 (1956); NLRB v. Publishers Printing Co., 625 F.2d 746 (6th Cir.1980); NLRB v. Sunnyland Packing Co., 557 F.2d 1157 (5th Cir.1977); Revere Camera Co. v. NLRB, 304 F.2d 162 (7th Cir.1962)
 
 
 [8]
 
 DISTRIBUTION OF LITERATURE AND SOLICITATION ON COMPANY TIME
 FOR NON-COMPANY ACTIVITIES
 Employees may not distribute union literature or solicit membership in unions, or fraternal, religious, social, or political organizations on Company time, or while employees to whom literature is being distributed, or whose membership is being solicited, are on Company time. Company time is that time which the employee is scheduled to be on duty and for which the employee is being paid, excluding rest periods, lunch periods, and time before and after the employee's working day.
 Solicitation by employees is permitted on Company property so long as the employees, both soliciting and those being solicited, are on their own time and the solicitation is conducted in a quiet and orderly manner and does not interfere with the operation of the Company's business. Meetings or speeches are not to be permitted; solicitation which results in disturbing or interfering with the work or function of any of the employees or department is forbidden; solicitation which is detrimental to maintaining the premises in a clean and attractive condition is forbidden.
 * * *
 It is a violation of the Company's No Solicitation rule either to solicit or be solicited in a manner prohibited by this rule.
 Solicitation for charity drives and fund raising campaigns are to follow the guidelines for solicitation as outlined above. The Company generally supports one all-out community charity drive. Prior approval is required for any additional charity drive held on Company property. There are times when expressions of friendship and goodwill for co-workers are permissible, but in order to protect employees from too frequent collections for such purposes written permission for such solicitation must be obtained from the store manager or personnel manager.
 Any violations of the Company No Solicitation rule should be reported at once to your immediate supervisor or a store staff member.
 
 
 [9]
 The no-solicitation rule bans solicitation by nonemployees only in the store and other store buildings. Although technically trespassers, the union organizers were apparently not acting in violation of the rule as posted when they distributed literature outside the store
 
 
 [10]
 In Hudgens, which involved picketing, the employer urged that Babcock & Wilcox controlled; the union argued that a statutory standard (not Babcock & Wilcox ) governed, since the activity in question was not organizational; and the Board urged that a first amendment standard should be applied. In its remand to consider the case under the statutory criteria alone, the Court apparently identified the Babcock & Wilcox standard with those criteria, but directed the Board to take account of the relevance of the fact, among others, that strike activity rather than organizational conduct was involved. 424 U.S. at 522-23, 96 S.Ct. at 1037-38
 
 
 [11]
 Although Babcock & Wilcox commands that "if the location of a plant and the living quarters of the employees place the employees beyond the reach of reasonable union efforts to communicate with them, the employer must allow the union to approach his employees on his property," 351 U.S. 105, 113, 76 S.Ct. 679, 684, 100 L.Ed. 975, this case was not argued as an "access" case under Babcock & Wilcox. We have doubts whether reasonable efforts by the union would in fact have enabled it to reach the employees with its message; at least, the difficulties would have been very substantial. Since the parties have not posed the issue exactly in these terms, however, we do not decide what the outcome would have been on the issue of access alone. Nonetheless, in accordance with our reading of Babcock & Wilcox, discussed above, access is an important factor in evaluating the strength of the competing interests at stake in a specific situation
 
 
 [12]
 This fact, inter alia, serves to distinguish the case at hand from that involved in Sears, Roebuck & Co. v. San Diego County District Council of Carpenters, 436 U.S. 180, 98 S.Ct. 1745, 56 L.Ed.2d 209 (1978). At issue in Sears was the question whether federal law preempted state jurisdiction in a situation involving a right arguably protected by the National Labor Relations Act. The activity in question was "area standards" picketing, that is, picketing by the carpenters' union because carpentry work in a Sears store was being performed by men who had not been dispatched from the union's hiring hall. The picketing took place on Sears' private walkways and parking lot, and the company sought in a state trespass action to remove the picketing to public sidewalks. Thus the question of trespass came naturally to the fore in Sears, as it had in Babcock & Wilcox
 In circumstances such as those presented here, the trespass issue is not presented in the same way. The organizers' status as "trespassers" or "invitees" under state property law can be made to turn entirely upon the property owner's desire as an employer to prevent communications about labor organization. This sort of analysis, however, must lead to circular reasoning since a business invitation can be withdrawn as soon as the employer is aware that its recipients are union organizers, and the entrants are thereby converted into "trespassers." We presume, therefore, that the Supreme Court's language about "trespassory" activity in the Sears opinion refers essentially to the fact that the premises were not being used in a manner consistent with their normal business use. This is not the situation here.
 
 
 [13]
 This fact distinguishes both Marshall Field and the case before us from McDonald's Corp., 205 N.L.R.B. 78 (1973) and Goldblatt Bros., Inc., 77 N.L.R.B. 1262 (1948), where the restaurant employees were within the group of employees being actively solicited by the union. The Board also noted in Goldblatt Bros. that many customers sat at a counter in the store restaurant; there is no counter service in Montgomery Ward's Buffeteria
 
 
 [14]
 See Marriott Corp., 223 N.L.R.B. 978 (1976) (solicitation in nonpublic areas of cafeteria); Bankers Club, Inc., 218 N.L.R.B. 11 (1975) (solicitation permissible in banquet room when no customers are present)