**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**BEVERAGE–AIR COMPANY, Respondent.**

**No. 11961.**

United States Court of Appeals Fourth Circuit.

Argued April 4, 1968.

Decided Sept. 27, 1968.

---

See also, 4 Cir., 391 F.2d 255.

Fred R. Kimmel, Atty., N.L.R.B. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Allison W. Brown, Jr., Atty., N.L.R.B., on brief) for petitioner.

Ernest W. Machen, Jr., Charlotte, N. C. (Blakeney, Alexander & Machen, Charlotte, N. C., on brief) for respondent.

Morgan C. Stanford, Atlanta, Ga. (Adair, Goldthwaite, Stanford & Daniel, Atlanta, Ga., Irving Abramson, Gen. Counsel, and Ruth Weyand, Associate Gen. Counsel, Washington, D. C., International Union of Electrical, Radio and Machine Workers, AFL-CIO, on brief) for intervenor.

Before BOREMAN, WINTER and BUTZNER, Circuit Judges.

WINTER, Circuit Judge:

The Labor Board found that the Beverage—Air Company (the "company") violated §§ 8(a) (1), (3) and (5) of the Labor-Management Relations Act, 29 U.S.C. §§ 158(a) (1), (3) and (5), during the course of its negotiations with the International Union of Electrical, Radio and Machine Workers (the "union"), and issued a remedial order of sweeping scope which required the company (a) to cease and desist from engaging in certain activities which the Board deemed to interfere with the exercise of the employees' organizational rights, (b) to offer reinstatement and backpay to one employee, whom the Board found was discriminatorily discharged after participating in a strike in July, 1965, and to other employees who conducted a strike against the company from January to April, 1966, (c) either to bargain collectively with the union or, at the request of the union, to sign a contract embodying the terms upon which the company and the union agreed in March, 1966, and (d) to give the employees the benefits which they would have received under this contract from the date which it should have been signed, plus six per cent interest. We agree that widespread and various violations of the Act have been established, and enforce the Board's order, except for that portion thereof which requires the company to grant backpay to the employees who were on strike in the early part of 1966.

—I—

Pursuant to a Board election, on April 26, 1965, the union was certified as the exclusive bargaining unit for certain specified employees of the company. On May 12, 1965, a union agent first contacted Buffington, the company's president, and negotiations between the parties continued until April, 1966. Bargaining sessions were held at an approximate rate of twice a month during this period, which was punctuated by two strikes, one in July, 1965, and the other from January 26, 1966, until the breakdown of the negotiations.

The indications are many that the company did not negotiate in good faith. It is well established that § 8(a) (5) requires an employer to supply information relevant to the bargaining issues if requested to do so by the union. See, e. g., NLRB v. Whitin Machine Works, 217 F.2d 593 (4 Cir. 1954). Nevertheless, here the company refused to supply the union with full information concerning its classification of jobs and its savings and loan, profit sharing and insurance plans. Similarly, although specifically requested to do so, it never notified the union negotiators of any of the 417 wage increases which it granted while the negotiations were being carried on. Moreover, some of the

bargaining positions taken by the company indicate that it was not making good faith efforts to reach an agreement. For example, on the issue of break periods, it insisted upon continuation of its existing policy and when the union finally agreed, it insisted on something less favorable to employees than its existing policy. On the issue of holiday pay, it offered substantially less than it was then giving to its employees.

The most convincing evidence that the company was not bargaining in good faith, however, is found in its actions after an agreement had apparently been reached on March 9, 1966. The week following this tentative accord was harmoniously spent in the preparation of a schedule for the return of the strikers, and on March 16 the company informed the union that if the employees ratified the contract, no one would be discharged for strike violence and all the strikers would be recalled within a three-week period. The next day, March 17, the proposed contract and recall schedule were submitted to the union membership and ratified, and the union and the company immediately agreed to sign the contract the following afternoon. That evening, however, the first intimation that all was not yet well occurred when the company informed the union that it had been unable to type the contract—although it had agreed to do so on March 9—and would need additional time.

March 18, the day on which the contract was originally scheduled to be signed, was a Friday; the company obtained a postponement, against the union's wishes, until the following Monday. Over the week-end, Charles Taylor, an ex-president of the local union who had remained at work during the strike and who subsequently became an assistant supervisor of the company, contacted several of the strikers and solicited them to return to work before the agreement was signed. He told them that if they returned to work under their own auspices money would be available to pay debts which they might have accumulated, he hinted that strikers who returned on their own would receive wage increases and he stated to one employee that whereas the company would grant only a five-cent wage increase in the contract with the union, it would grant a ten- or fifteen-cent increase in the absence of the union.

The company's only defense to the Board's contention that these week-end events manifested the company's desire to sabotage the union is that Taylor's activities were not known or authorized by the company, and that he was motivated only by a desire to expiate his guilt in having led his fellow-employees into committing the sin of unionization. The Board could properly find this defense unconvincing. In his talks with the strikers, Taylor made certain predictions, such as that, despite its proposed recall schedule, the company would not permit all of the strikers to return to work for at least six months, which proved to be true and which, without Delphic powers, Taylor could have correctly made only if he had been consulted by the company officials and told of their plans.[1]

The company's attempt to undermine the union by enlisting Taylor's support failed, and on Monday the meeting at which the contract was to be signed was held. However, the company had no intention of signing the document, as it quickly manifested. First, Buffington, the company's president required Daniels—the union negotiator with whom the company had been bargaining from January 29—to produce a card identifying him as a representative of the union, and when Daniels could only find his 1965 card, Buffington stated that he would not sign the contract. Then Taylor walked into the meeting and claimed that he was still the president of the

1. Another prediction made by Taylor, which proved to be true, was that, contrary to its previous position, the company would require at the Monday meeting all of the local union officials to sign the contract.

local union. Although Taylor had given the company written evidence of his resignation from the union on March 14, Buffington pretended that Taylor's claim was a disquieting one which merited additional consideration. As a final blow, Buffington then informed Daniels that the company would be able to take back only two or three of the strikers immediately, perhaps another two or three in a month and would possibly never be able to use others. In other words, *the company completely rescinded its recall proposal which had been submitted with the contract to the union membership for ratification.* Daniels stated that in light of the company's action, he could not sign the contract and left the meeting. There were several communications and meetings between the parties during the following month, but each side remained rigid in its position and no further agreement was reached.

◼ Under these circumstances, the evidence is substantial that the company violated § 8(a) (5) by refusing to bargain in good faith. We are aware, as the company contends, that the prolonged bargaining deadlock can partially be attributed to the intransigence of the union negotiators on the issue of whether the local or the international union was to be recognized by the company and made a party to the contract. However, neither the company nor the union made their disagreement on this question an insurmountable obstacle to the bargaining, and time and time again on those issues which were negotiated, the company demonstrated its desire to avoid reaching an agreement with the union. In any event, whatever uncertainty might inhere in inferences drawn from the bargaining itself is dispelled by the company's manifested desire to avoid executing the contract once agreement had at last apparently been reached.

—II—

◼ The conclusion that the Board's finding that the company was not bargaining in good faith was supported by substantial evidence carries with it the ancillary conclusion that the twenty-one employees who were on strike from January to April, 1966, were unfair labor practice strikers because the evidence is uncontradicted that they began the strike because of the company's intransigence in bargaining and continued the strike because the company refused to execute the contract after the union had ratified it and repudiated the recall schedule which the union had approved. As unfair labor practice strikers, they are entitled to reinstatement, regardless of the fact that their positions may have been filled by other workers. Mastro Plastics Corp. v. NLRB, 350 U.S. 270, 278, 76 S.Ct. 349, 100 L. Ed. 309 (1956). In its order, however, the Board went further and required that these employees be granted backpay dating from March 21, 1966. Such an order, to be valid, is necessarily based upon a finding that the strikers made an unconditional offer to return to work on that date. See, e. g., Mastro Plastics Corp. v. NLRB, supra; NLRB v. Fotochrome, Inc., 343 F.2d 631 (2 Cir. 1965); Philip Carey Mfg. Co., etc. v. NLRB, 331 F.2d 720 (6 Cir.), cert. den., 379 U.S. 888, 85 S.Ct. 159, 13 L.Ed.2d 92 (1964). See also, NLRB v. Greensboro Coca Cola Bottling Co., 180 F.2d 840 (4 Cir. 1950). We cannot agree that such an offer was made and, accordingly, do not enforce this portion of the Board's order.

There is no direct evidence on the question of whether the strikers' offer to return to work was unconditional, because the breakdown of the final negotiations was caused by the company's refusal to follow the recall schedule which it had proposed and which had been ratified by the union membership. Thus, the record specifically demonstrates that the union's agreement to sign the contract was conditioned upon the adoption of the recall schedule, but is silent as to whether the offer to return to work embodied in the recall schedule was conditioned upon the signing of the contract. However, the back-

ground against which the strikers' offer was made indicates that it was not absolute unto itself, but was, together with the proposed contract, part of a "package" designed to end the strike.

Throughout the strike period the company clearly manifested a willingness to reinstate the strikers on an individual basis immediately. Of course, this policy was not an altruistic one, being designed to dissipate the strength of the union, and we do not suggest that the strikers were required to accept the company's offers. On the other hand, it is significant that in the face of an apparent willingness on the part of the company to reinstate the strikers, the record does not reveal any instance in which the union proposed that before further negotiation the strikers be returned to work as a unit and that the bargaining be carried on under non-strike conditions. To the contrary, the union was using the strike as an attempted means to force the company's hand at the bargaining table. This is made clear by the opening sentence in one of the union's contract proposals made on February 10, that "the Union submits the following *as its program for settling the strike* now in effect." (emphasis added) At the hearing before the trial examiner, Daniels, one of the union negotiators, reasserted that the union believed that the February 10 proposal "would bring the strike to a successful end," and he made no suggestion that subsequent to that date the union decided to end the strike regardless of whether a contract agreement was reached.

An analogous situation was presented in Northern Virginia Sun Pub. Co., 134 NLRB 1007 (1961). There, certain employees, who had been discharged by respondent company, were offered reinstatement but refused to return to work unless their fellow-employees whom they claimed to have been discriminated against along with themselves, in violation of § 8(a) (3), were also reinstated. The Board held that although their claim was well-founded, those employees who refused the company's reinstatement offer could not recover backpay after the date of that offer.[2] In language which speaks to the somewhat different situation which we now confront, the Board stated: "As their demands also related to [the company's] unfair labor practices, we find that they became unfair labor practice strikers, who are entitled to reinstatement, upon application. However, as strikers, they are not entitled to backpay." 134 NLRB, at 1009.

Under the circumstances of the instant case, although the strikers were unfair labor strikers, they remained on strike for the purpose of improving the union's negotiating position at the bargaining table. They were "strikers who were withholding their services in an attempt to compel Respondents to comply with their demands." Northern Virginia Sun Pub. Co., 134 NLRB, at 1009. On no occasion did they make an offer to return to work which was unconnected with a demand that a contract be signed. In the absence of such an unconditional offer, the strikers are not entitled to backpay.

—III—

The Board's order requires the company either to bargain in good faith with the union to reach a contract settlement, or, at the request of the union, to sign the agreement which had been reached between the parties in March, 1966, and, in any event, to reimburse its employees, with six per cent interest, for the loss of any benefits which have accrued to them under the heretofore unsigned agreement.

We considered a similar Board order in NLRB v. Huttig Sash and Door Co., 362 F.2d 217 (4 Cir. 1966), and initially

---

2. We note that the specific holding in *Northern Virginia Sun Pub. Co.* was limited to the situation where the company had made "a bona fide offer of all the available vacancies, and was not limiting the offers * * * in furtherance of a scheme to divide the strikers." 134 NLRB, at 1010, note 8.

found the portion of it granting the union the option of beginning bargaining anew invalid. Our reasoning was that it was inconsistent to find that the company had committed an unfair labor practice by refusing to sign an agreement and to issue an order permitting the union to repudiate this very agreement. On a motion for rehearing, however, after denying the motion on the ground that the question of the validity of the alternative bargaining order had become academic by virtue of the fact that the expiration date of the agreed-upon contract had passed, we stated that we would "not deem the decision in this case as precluding" the issuance of the type of order fashioned by the Board and would "be prepared to consider it on its merits" in a future case.[3]

■ Considering the Board's order on its merits, we find that under the particular circumstances involved in the present case its issuance was properly within the Board's discretion. The final clause of the agreement which the company and the union reached in March, 1966, provided that the contract was to be renewed automatically from year to year for additional one-year periods unless either party gave notice of a desire to amend or terminate it at least sixty days before its scheduled date of expira-

tion. The alternatives embodied in the Board's order are designed to give effect to this clause of the contract. Therefore, the inconsistency which we found to have existed in *Huttig* between the Board's finding that the company committed an unfair labor practice in refusing to sign the contract and the Board's order permitting the union to bargain for a new contract does not exist here. To grant the union the right to bargain for a new contract is simply to enforce the right which it had under the contract which the company refused to sign.[4] The reasoning which we followed in *Huttig* being thus inapplicable, it is no bar to enforcement of the Board's order because of the alternatives contained therein. The direction to reimburse employees for loss of benefits, with interest, which would have accrued during this litigation under the contract which the company refused to sign was no abuse of the Board's discretion to fashion appropriate remedies since the employees lost those benefits as a result of the company's wrongdoing.[5] These portions of the order will be enforced.

—IV—

The Board found that the company violated §§ 8(a) (3) and (1) in discharging employee Marvin Wyatt.

3. In *Huttig* we found that the granting of six per cent interest by the Board was not an abuse of its discretion, and we now reaffirm this holding.

4. The fact that the duration clause provided for one-year renewal periods of the contract similarly provides an answer to the company's contention that the Board's order should require that the company, at the union's request, now sign a contract extending only eight months—the first period of duration under the March contract.

5. We recognize, of course, that the Board's order effectively nullifies the right to amend or terminate the contract which the company would have possessed between October, 1966 (the initial terminal date of the contract set forth in the duration clause), and the present if the March contract had in fact been in effect. However, this is a necessary consequence

of the general purpose of the Act to restore the situation which would have existed if the unfair labor practice had not been committed. See, e. g., NLRB v. Warrensburg Board & Paper Corp., 340 F.2d 920 (2 Cir. 1965); Schill Steel Prods., Inc., 63 LRRM 1388 (1966). An assumption could be made that in October, 1966, the company would have rescinded all of the benefits which it agreed to give its employees in March, of that year, and that the restoration of the *status quo ante*, therefore, involves only giving the March, 1966, agreement eight months' effect. But in the absence of proof of exceptional circumstances indicating a company's perilous financial condition, see NLRB v. George E. Light Boat Storage, Inc., 373 F.2d 762, 770 (5 Cir. 1967), we do not think it proper to make this assumption. To do so would enable an employer to benefit from his own unfair labor practice.

There is substantial evidence in the record to support this finding.

Wyatt left the company's employ in March, 1965, and moved to Florida. Despite the fact that he had a record of absenteeism, Wyatt was acknowledged to be a good worker, and in April the company telegraphed him and persuaded him to return to work. After his return, his absenteeism persisted, some, but not all, of his absences being considered by the company to be authorized. On July 20, Wyatt was again reported in as sick. Horton, Wyatt's supervisor, did not believe that Wyatt was ill, and suggested to Wilson, the plant superintendent, that he check the grocery store owned by Wyatt's brother to see whether Wyatt was working there for the day. Wilson did go to the store, and was told by a young lady working at the counter that Wyatt was out driving a produce truck. Wilson returned to the plant, and reported what he had learned to Horton and to Garrett, the Personnel Supervisor.

The Board has not contended that the company did not have adequate ground for discharging Wyatt at this time. However, although the normal practice of the company was to pull the timecard of an employee whose discharge was being contemplated so as to require him to see his supervisor and explain his misconduct, when Wyatt returned to work the next day nothing was said. The following day, July 22, was the first day of the first strike against the company. This strike continued until July 27. During the strike Wyatt used his pick-up truck to transport strikers back and forth from the picket line, and, according to testimony credited by the trial examiner, he was observed in this activity by the company's president.

Wyatt's name was included on the recall list prepared by the company at the end of the strike, and he was scheduled to return to work on July 30. However, when Wyatt went to the plant on July 29 to collect his pay for work performed before the strike, he was informed by Wilson that he was being discharged for excessive absenteeism and falsifying the reasons therefor. The Board found that this explanation was a mere sham, and that between the time that the recall schedule was prepared and July 29, the company had decided to discharge Wyatt because of his strike activities.

We cannot say that the Board's conclusion was not justified by the facts. Despite the fact that, to the knowledge of three supervisors, the company had caught Wyatt red-handed in a serious instance of misconduct on July 20, no action was taken against him then or on the following day. Moreover, Wilson and Garrett, two of the supervisors who knew of Wyatt's dereliction, participated in preparing the recall schedule on which Wyatt's name was included, and yet neither of them saw fit to bring to the attention of the company's president that a man was being recalled who was deserving of immediate discharge. Under these circumstances, the Board's finding that the relationship between Wyatt's discharge and his strike activity was more than a mere coincidence must stand.

—V—

The Board also found that the company committed independent § 8(a)(1) violations by: (1) maintaining a written rule against all solicitations any place in the plant, whether during working or non-working hours; (2) threatening and promising benefits to employees to discourage them from supporting the union; (3) providing free canteen service during both of the strikes to those employees who came to work; and (4) sponsoring a program of courses, held one night a week, for the purpose of interfering with union meetings.

In a prior order issued in this case, we ruled that the company should cease and desist from enforcing the no-solicitation rule contained in its handbook for employees in non-working areas of the plant during non-working hours. NLRB v. Beverage-Air Co., 391 F.2d

255 (4 Cir. 1968). Presumably, in light of the company's allegation that its rule has never been so applied, this order caused no change in the company's practice. However, regardless of the circumstances under which the rule has been applied, we now enforce the Board's broader order prohibiting the company from maintaining its rule since the mere existence of a broad no-solicitation rule may chill the exercise of the employees' § 7 rights.

We also enforce the other portions of the Board's order relating to the § 8(a) (1) violations. There can be no dispute that the threats and promises of benefit, which the Board found upon substantial evidence to have been made to certain employees, constituted violations of the Act. See, e. g., Filler Products, Inc. v. NLRB, 376 F.2d 369 (4 Cir. 1967); Florence Printing Co. v. NLRB, 333 F.2d 289 (4 Cir. 1964). Similarly, the supplying of free cigarettes and lunches from the company canteen to the workers during the two strikes, which, by a conservative estimate, amounted to a six-cent wage increase, discouraged all of the employees from protecting their organizational rights by engaging in an unfair labor practice strike.

The remaining § 8(a) (1) question is more troublesome, but because the portion of the Board's order relating to it is based upon a narrow finding of fact and because it is narrow in its scope, we enforce it. The company sponsored Tuesday evening classes for the benefit of its employees at a neighborhood technical school. The program was voluntary, the only incentive for the employees to participate in it being to improve themselves. Although such a program would necessarily compete, as the Board found, with various other activities—including union meetings—available to the employees in their leisure time, we would not find on that ground alone that its existence constituted a violation of § 8(a) (1). However, the Board found on substantial evidence that the company had instituted this program for the specific purpose of discouraging employee attendance at union meetings, and the Board's order was limited in its prohibition to "scheduling training courses at such times as to interfere with, and for the purpose of interfering with, union activity." It is in this narrow context that we enforce this portion of the Board's order.

Enforcement granted in part and denied in part.