**BAPTIST MEDICAL SYSTEM,**
Petitioner/Cross–Respondent,

v.

**NATIONAL LABOR RELATIONS
BOARD,**
Respondent/Cross–Petitioner.

No. 88–1811.

United States Court of Appeals,
Eighth Circuit.

Submitted Nov. 17, 1988.

Decided June 6, 1989.

James W. Moore, Little Rock, Ark., for petitioner/cross-respondent.

Robert F. Mace, NLRB, Washington, D.C., for respondent/cross-petitioner.

Before FAGG, Circuit Judge, FLOYD R. GIBSON, Senior Circuit Judge, and WOLLMAN, Circuit Judge.

FLOYD R. GIBSON, Senior Circuit Judge.

Baptist Medical System (the hospital) petitions for review of an order of the National Labor Relations Board (the Board). The Board ruled that the hospital violated section 8(a)(1) of the National Labor Relations Act (NLRA or the Act) by ordering two nonemployee union organizers to leave its cafeteria and by coercively interrogating an employee regarding her union sympathies. The Board filed a cross-application for enforcement of its order. The International Ladies' Garment Workers' Union (the union) has intervened in support of enforcement. For the reasons explained below, we deny enforcement.

I. BACKGROUND

Baptist Medical System, located in Little Rock, Arkansas, is a medical complex that includes a professional office building and a hospital. In October 1981 the union began an organizational campaign among the

hospital's nursing employees. In November of that year, the hospital issued revised rules on solicitation and distribution of literature. The rules prohibited employees from soliciting or distributing during work time and prohibited all solicitation and distribution in patient care areas. Regarding nonemployees, the hospital rules provided that "visitors, patients and other non-employees may not solicit or distribute literature on any hospital property for any purpose at any time."

The hospital operates a cafeteria on the ground floor that is for use by employees and patients as well as members of the general public. On December 10, 1981, union organizers Scott Griffiths and Mary Bolden went to the hospital cafeteria accompanied by off-duty nursing employees. The off-duty employees distributed union literature provided by the organizers while the organizers remained seated at a table answering employees' questions regarding the union. The organizers did not distribute any literature or sign up any employees for the union. All distribution was done by off-duty employees. However, an open box containing union literature was present on the organizers' table. After the organizers had been in the cafeteria for approximately 30 minutes, the hospital's Personnel Director, Tom McCamey, confronted them and told them that he considered them to be violating the hospital's rule against non-employee solicitation and distribution. McCamey instructed the organizers that they could stay for 15 minutes to have a drink and 30 minutes to eat a meal. McCamey threatened the organizers with arrest if they refused to leave. The organizers then left the cafeteria voluntarily.[1]

The other incident giving rise to this petition occurred when nurse Carolyn Hobbs was questioned regarding her union sympathies. On December 14, 1981, Hobbs was instructed to report to her supervisor's office. Hobbs was met there by Ann Dunkerson, Director of Nurses for the Acute Care, Outpatient Surgery, and Operating Room Departments. Dunkerson explained that she understood that Hobbs was prounion and had on occasion passed out union literature in the hospital cafeteria. Dunkerson told Hobbs that while she was within her rights in passing out literature, other nurses had complained that she infringed upon their free time in the cafeteria. Dunkerson then asked Hobbs why she supported the union. Hobbs replied that she preferred not to debate the issue, to which Dunkerson stated that she was not interested in a debate but was personally interested in Hobbs' views. Hobbs then proceeded to explain her support for the union and criticisms of the hospital's management. The conversation lasted approximately 20 minutes.

Regarding the cafeteria incident, the Administrative Law Judge found that because the organizers did not solicit or distribute literature in the cafeteria and used the facility in a manner consistent with its normal use, the hospital violated the nursing employees' section 8 rights by ordering the organizers to leave. Further, the ALJ found that Dunkerson's conversation with Hobbs constituted coercive interrogation in violation of section 8.

The Board affirmed the ALJ's findings and adopted its recommended order. This petition for review followed.

## II. DISCUSSION

### A. Nonemployee Access to Public Cafeteria

Section 7 of the NLRA guarantees employees "the right to self-organization, to form, join, or assist labor organizations * * *." 29 U.S.C. § 157 (1982). Section 8(a)(1) provides that "[i]t shall be an unfair labor practice for an employer—(1) to inter-

---

1. Griffiths and Bolden had also been in the cafeteria with off-duty employees on December 4. On that day, they spent approximately five hours in the cafeteria. For the most part they conducted themselves as they did on December 10. They sat at a table with literature in front of them and answered employees' questions.

However, on December 4, one of the organizers went from table-to-table to respond to questions. McCamey confronted the organizers on December 4 but did not order them to leave. He did, however, instruct them not to move from table-to-table.

fere with, restrain, or coerce employees in the exercise of the rights guaranteed in [section 7]." 29 U.S.C. § 158(a)(1) (1982).

It is well established that the right of employees to self-organize "necessarily encompasses the right effectively to communicate with one another regarding self-organization at the jobsite," *Beth Israel Hospital v. NLRB*, 437 U.S. 483, 491, 98 S.Ct. 2463, 2469, 57 L.Ed.2d 370 (1978) (footnote omitted), and also "depends in some measure on the ability of employees to learn the advantages of self-organization from others." *NLRB v. Babcock & Wilcox Co.*, 351 U.S. 105, 113, 76 S.Ct. 679, 685, 100 L.Ed. 975 (1956). At the same time, however, employees' rights to learn and communicate about self-organization at the jobsite may conflict with the rights of employers to maintain discipline and productivity and to control access to their property.

In *Babcock*, 351 U.S. 105, 76 S.Ct. 679, the Supreme Court established the standard which governs when an employer's private property rights conflict with the right of employees to be contacted by union organizers at the workplace. The Court emphasized that the standard applicable to nonemployee access to an employer's private property is quite different from that which applies when employees seek to self-organize at the jobsite. The Court noted that while "[n]o restriction may be placed on the employees' right to discuss self-organization among themselves, unless the employer can demonstrate that a restriction is necessary to maintain production or discipline * * * no such obligation is owed nonemployee organizers." *Id.* at 113, 76 S.Ct. at 685. Accordingly, the Court in *Babcock* held that

> an employer may validly post his property against nonemployee distribution of union literature if reasonable efforts by the union through other available channels of communication will enable it to reach the employees with its message and if the employer's notice or order does not discriminate against the union by allowing other distribution.

*Id.* at 112, 76 S.Ct. at 684.

*Babcock* involved distribution of union literature, but the Court subsequently applied the *Babcock* standard to solicitation activity in *Central Hardware Co. v. NLRB*, 407 U.S. 539, 92 S.Ct. 2238, 33 L.Ed.2d 122 (1972).

In cases where nonemployee union organizers have sought access for organizational purposes to a portion of an employer's property that is open to the public, such as a cafeteria, the Board has not applied the two-part test announced in *Babcock*. In *Ameron Automotive Centers*, 265 N.L.R.B. 511 (1982), the Board stated that in such cases "the *Babcock & Wilcox* criteria need not be met, since nonemployees cannot in any event lawfully be barred from patronizing the restaurant as general members of the public." *Id.* at 512. The standard consistently used by the Board where nonemployees seek access to a public area is that access must be permitted if the nonemployees use the public facility in a manner consistent with its intended use and are not disruptive. *See Montgomery Ward & Co., Inc.*, 288 N.L.R.B. No. 20, 1987–1988 NLRB Dec. (CCH) ¶ 19, 337 (Mar. 24, 1988); *Hughes Properties, Inc.*, 267 N.L.R.B. 1167 (1983), *enf'd*, 758 F.2d 1320 (9th Cir.1985) (involving solicitation by off-duty employees); *Ameron Automotive Centers*, 265 N.L.R.B. 511 (1982); *Montgomery Ward & Co., Inc.*, 263 N.L.R.B. 233 (1982), *enf'd as modified*, 728 F.2d 389 (6th Cir.1984) (per curiam).

The Board applied this standard in the instant case, concluding that the hospital "could not prevent Griffiths and Bolden from using its public restaurant in an orderly way, not disruptive of its business." *Baptist Medical System*, 288 N.L.R.B. No. 97, 1987–1988 NLRB Dec. (CCH) ¶ 19,399 (May 10, 1988).

We believe that in addressing the question of nonemployee access to areas of an employer's property designated as open to the public, the Board has failed to adequately take into account the general principles expressed in *Babcock*. We recognize that the two-part test stated in *Babcock* is not conducive to mechanical application in all nonemployee access cases; we do not hold that the two *Babcock* criteria should

be rigidly applied to the facts of this case. However, as the Seventh Circuit noted in *Montgomery Ward & Co., Inc. v. NLRB,* 692 F.2d 1115 (7th Cir.1982), *cert. denied,* 461 U.S. 914, 103 S.Ct. 1892, 77 L.Ed.2d 282 (1983), even where the *Babcock* test does not precisely fit a set of facts, the principles stated in that case "must be an important starting point for analysis of any solicitation activity by nonemployees." 692 F.2d at 1124–25.

The Court in *Babcock* emphasized that an employer's duty to allow organizational activity by nonemployees on the jobsite is far less extensive than its duty to allow such activity by employees. *Babcock,* 351 U.S. at 113, 76 S.Ct. at 685. Regarding nonemployee access, the Court stated that "[t]he Act requires only that the employer refrain from interference, discrimination, restraint or coercion in the employees' exercise of their own rights. It does not require that the employer permit the use of its facilities for organization when other means are readily available." *Id.* at 113–14, 76 S.Ct. at 684–85. The Court in *Babcock* also stressed the principle that where employees' self-organization rights conflict with an employer's private property right, "[a]ccommodation between the two must be obtained with as little destruction of one as is consistent with the maintenance of the other." *Id.* at 112, 76 S.Ct. at 684.

■ While we recognize that the primary responsibility for making the accommodation between section 8 and private property rights rests with the Board, we believe that the accommodation reached by the Board in this case ignores the principles stated in *Babcock.* As stated above, *Babcock* teaches that an employer does not have an affirmative duty to allow the use of its facilities by nonemployees for organizational purposes. *Id.* at 114, 76 S.Ct. at 685. We do not believe that this principle simply becomes inapplicable because the nonemployees attempt to use an area that the employer has designated for public use. By inviting the public to use an area of its property, the employer does not surrender its right to control the uses to which that area is put. Unquestionably, an employer may not discriminate by allowing some nonemployee solicitation activity and prohibiting such activity by union organizers. *Id.* at 112, 76 S.Ct. at 684. But, when an employer has chosen not to allow any solicitation or promotional activity by nonemployees in its public facility and union organizers attempt to use that facility for promotional or solicitation purposes, we believe that *Babcock* contemplates that such activity may validly be prohibited, even where the organizers' activity is not actually disruptive. According to the standard applied by the Board, union organizers essentially must be granted access so long as their activity is not disruptive of the facility's operation. We believe, in light of *Babcock,* that this standard does not afford an adequate accommodation of the employer's private property rights.

■ In the instant case, the union organizers sought to use the hospital cafeteria in a manner that went beyond casual conversation within a defined group. They sought to use the facility as a setting for a question-and-answer exchange where off-duty employees would notify other off-duty employees of the organizers' presence and their availability for questions at a particular table. Further, the organizers had an open box of union literature in front of them at their table. It is clear that the organizers were using the cafeteria solely for purposes of promoting the union and not at all to patronize the cafeteria. This type of union activity is not one usually associated with a cafeteria and could be particularly disturbing in a hospital setting.

The evidence also indicates that the hospital did not engage in discrimination against the union by instructing the organizers to leave. There was no evidence offered that the hospital allows any solicitation or promotional activity by nonemployees on its premises. In addition, the union has ample access to the nurses employed by the hospital other than meetings in the cafeteria. Neither the Board nor the union has argued that there exist serious obstacles to effective communication with the hospital nurses about unionization. These are considerations which, according

to *Babcock,* are relevant in resolving the tension between employees' self-organization rights and an employer's property rights. *See Montgomery Ward,* 692 F.2d at 1125–26 (applying the *Babcock* criteria in case involving nonemployee access to public area of employer's property).

The Board emphasizes that the organizers did not distribute literature, sign up new members, or cause disruption. Nevertheless, in light of *Babcock* we are not prepared to conclude that an employer must allow nonemployee access to public areas so long as the activity falls short of actual distribution of literature or disruption. We believe that the conduct engaged in by the organizers in this case constituted blatant promotional activity and that the hospital, in the exercise of its private property rights, could prohibit it without running afoul of the employees' section 8 rights.

Accordingly, we conclude that the hospital did not violate the NLRA by ordering the nonemployee union organizers to leave its cafeteria.

### B. Coercive Interrogation

Section 8 of the Act prohibits, among other things, interrogation of employees which interferes with, restrains, or threatens their rights of self-organization. That section does not prohibit all employer questioning of employees regarding unionization. "Questioning which does not coerce or restrain employees in their right to organize is permissible; when properly exercised it is protected by the constitutional right to freedom of speech, which is recognized in § 8(c) of the Act * * *." *NLRB v. Douglas Division, Scott & Fetzer Co.,* 570 F.2d 742, 745 (8th Cir.1978).[2]

This court has identified five factors that are important to consider in reviewing claims of coercive interrogation:

a history of employer hostility and discrimination, the nature of the information sought (e.g., was the interrogator seeking information from which he could take action against individual employees), the identity of the questioner (i.e., what was his position in the company), the place and method of interrogation, and the truthfulness of the reply (e.g., did the interrogation inspire fear leading to evasive answers).

*General Thermo, Inc. v. NLRB,* 664 F.2d 195, 197 (8th Cir.1981) (quoting *NLRB v. Ritchie Mfg. Co.,* 354 F.2d 90, 99 (8th Cir. 1966)).

■ Applying these factors to the instant case, we find the evidence insufficient to support the Board's finding that Hobbs' section 8 rights were violated when Dunkerson questioned her. The record indicates that Dunkerson arranged the meeting with Hobbs for a legitimate reason: to inform Hobbs that the hospital management had received several complaints from other employees that Hobbs was infringing on their free time while passing out union literature in the cafeteria. Dunkerson did then proceed to ask Hobbs why she was prounion and what problems she had with hospital management. However, the conversation was *not coercive or threatening in nature.* It appears that Dunkerson questioned Hobbs in order to understand what criticisms Hobbs and other nurses had of the hospital management rather than to restrain Hobbs' union activity or to collect information that could later be used against her. And, Hobbs spoke freely, at length, and in a manner that did not indicate fear or intimidation. The ALJ found it relevant in examining this issue that Hobbs testified that she was concerned that she would be denied her customary raise as a result of expressing her union support. However, Hobbs' testimony in this regard indicates that no disciplinary action has actually been taken against her and that she only speculated that she would be denied a raise in the future and that this denial would be a result of her union support.

---

**2.** Section 8(c) of the Act provides:

The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an un-

fair labor practice under any of the provisions of this subchapter, if such expression contains *no threat of reprisal or force or promise of benefit.*

29 U.S.C. § 158(c) (1982).

**666**

We do not consider such speculation to constitute evidence that Hobbs suffered adverse consequences as a result of her expression of her union sympathies. The ALJ's cavalier disregard of the constitutional guarantee of freedom of speech renders meaningless that constitutional guarantee.

We also note that the ALJ misstated the position held by Dunkerson at the time of the questioning. The ALJ identified Dunkerson as the Director of Nursing, suggesting that Hobbs was questioned by the highest-ranking nursing employee in the hospital. Yet, the record clearly indicates that Dunkerson was not the overall Nursing Director, but was the supervisor of three departments.

In sum, we do not believe that the record supports the Board's conclusion that Dunkerson coercively interrogated Hobbs in violation of section 8 of the Act. Dunkerson met with Hobbs to inform her of complaints from other employees and asked her in a nonthreatening fashion about the union and her criticisms of the hospital management. Hobbs spoke freely and honestly, and admits that she has felt free to continue her union support since the incident.

Accordingly, we hold that the hospital did not violate section 8 of the Act by coercively interrogating Hobbs.

### III. CONCLUSION

Having concluded that there exists insufficient evidence in the record to support the Board's findings that the hospital violated the Act by requiring the union organizers to leave its cafeteria and by questioning Hobbs, we grant the hospital's petition for review and deny the Board's cross-application for enforcement of its order.