NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

SOUTHERN MARYLAND HOSPITAL
CENTER, Respondent.

No. 89–2476.

United States Court of Appeals,
Fourth Circuit.

Argued May 9, 1990.

Decided Oct. 15, 1990.

As Amended Nov. 8, 1990.

Robert Francis Mace, N.L.R.B., Washington, D.C., argued (Jerry M. Hunter, Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Aileen A. Armstrong, Deputy Associate Gen. Counsel, Linda J. Dreeben, Supervisory Atty., N.L.R.B., Washington, D.C., on the brief), for petitioner.

Warren Malcolm Davison, Littler, Mendelson, Fastiff & Tichy, Baltimore, Md., argued (Thomas P. Dowd, Littler, Mendelson, Fastiff & Tichy, Baltimore, Md., on the brief), for respondent.

Before PHILLIPS, Circuit Judge, McMILLAN, Senior District Judge for the Western District of North Carolina, sitting by designation, and YOUNG, Senior District Judge for the District of Maryland, sitting by designation.

PER CURIAM:

We are called on once again to review the labor situation at Southern Maryland Hospital Center (Southern Maryland or hospital), a full-service medical facility in Clinton, Maryland, with over 1200 employees. Since 1981, the Office and Professional Employees International Union, Local No. 2, AFL–CIO (union) has waged two organizational campaigns at the hospital. The first election campaign, which ran from early 1981 to June 1982, resulted in the defeat of all labor organizations. In response to union charges, the National Labor Relations Board (NLRB or Board) cited the hospital for numerous unfair labor practices during the election campaign. On appeal, we granted enforcement in part and refused enforcement in part. *Southern Maryland Hospital Center v. NLRB*, 801 F.2d 666, 668–74 (4th Cir.1986). This case stems from the union's second organizational campaign in 1983–1984. We again deny enforcement in part and grant enforcement in part.

I.

The facts surrounding the claimed violations are largely undisputed. On February 23, 1984, two off-duty employees stood in front of the hospital's main entrance at 6:30 a.m. and distributed union literature to arriving day-shift employees. The main entrance to the hospital is composed of wide double doors and one employee stood between the doors and the other stood to the right. According to the hospital, virtually all of its patients and about 40% of its staff use the main entrance, with the remaining 60% using the hospital's side and rear entrances.[1] Consequently, traffic at the main entrance during this early hour was light. After 5–10 minutes of leaflet distribution, a hospital security guard approached the employees and asked them to stop their distribution. Upon being told that the hospital's owner was quite upset over union leafletting from the first organizational campaign, the employees discontinued their activity and returned to work. No other attempts to distribute union literature at building entrances were made after this incident.

Greater problems arose, however, over the use of the hospital's subsidized cafete-

---

1. The hospital's emergency room is located about 37 feet from the main entrance, and the facility's ambulance entrance is located an additional 59 feet from the ER entrance.

ria. In the aftermath of the 1982 union elections, in which the hospital occasionally allowed union organizers to use the hospital's cafeteria for organizational activity, the hospital posted a sign outside its cafeteria stating "Cafeteria available for employees, patients, patients' visitors, and medical staff only. No solicitors." The cafeteria is located on the ground floor of the facility, one floor below the main entrance, and is not readily accessible to the public. Since the formation of the no-solicitation policy, the hospital has tried to restrict admittance to the above groups, but there have been occasions where hospital employees and their family members have taken advantage of the cafeteria's inexpensive meals.

On several occasions in February and March 1984, nonemployee union representatives walked past the hospital's reception desk and proceeded to the cafeteria where they met with employees. Twice, the union organizers used the premise of picking up and dropping off volunteer applications to get past the reception desk and into the cafeteria. On March 15, three union recruiters walked past the reception desk and proceeded to the cafeteria where they met with employees for 45 minutes. During this time, two hospital administrators came in and the sat down at the same table as the union representatives. Hospital security director John Butschky also observed the union's activities, at one point moving to an adjacent table to observe the representatives' actions.

At noon the next day, when two of the same union organizers returned to the cafeteria (this time with visitors' passes), Butschky sat down at the same table with them, followed by another hospital administrator, who joined Butchsky at the organizers' table. After some comments were exchanged, the organizers left the cafeteria. Four days later, union organizer Burton returned to the hospital, approached the volunteer desk, and was told by a security guard, who cited the hospital's no-solicitation rule, that she could not enter the cafeteria.

Also at issue in this appeal are Rules 24 and 25 of the hospital's disciplinary policy. Rule 24 states that the "unauthorized presence" on hospital property would result in a three-day suspension from the grounds; Rule 25 provides a similar suspension for "malicious gossip or derogatory attacks" on fellow employees and patients.

## II.

Upon the complaint of the Union, the ALJ held a three-day hearing, and concluded that the hospital violated section 8(a)(1) of the National Labor Relations Act (Act) by (1) barring employees from distributing union literature at the main entrance; (2) selectively and disparately denying union organizers from the cafeteria; (3) engaging in surveillance of the union's activities in the cafeteria; and by (4) maintaining overly broad disciplinary rules that coerced employees in the exercise of their bargaining rights. In a summary order, the Board adopted the findings of the ALJ and ordered the hospital to cease and desist from interfering with the bargaining rights of the employees. The Board also ordered the hospital to rescind disciplinary rules 24 and 25. The Board has petitioned for enforcement of these orders.

## III.

Section 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1) (1982), prohibits employer conduct that "interfere[s] with, restrain[s], or coerce[s] employees" in the exercise of their rights under section 7 of the Act, 29 U.S.C. § 157. Section 7 guarantees employees "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other activities for the purpose of collective bargaining...." In reviewing the alleged violations of the Act, we must sustain the Board's findings and grant enforcement if the findings are supported by substantial evidence on the record as a whole. *NLRB v. Kiawah Island Co.*, 650 F.2d 485, 489 (4th Cir.1981). Similarly, we must uphold the Board's conclusions of law if based upon a reasonably

defensible construction of the Act. *NLRB v. United Food & Commercial Workers, Local 23*, 484 U.S. 112, 108 S.Ct. 413, 98 L.Ed.2d 429 (1987).

### A. Distribution of Literature At Front Entrance

█ In *Beth Israel Hosp. v. NLRB*, 437 U.S. 483, 500, 98 S.Ct. 2463, 2473, 57 L.Ed.2d 370 (1978), the Supreme Court held that a hospital may not prohibit union solicitation by employees unless the hospital demonstrates that the prohibition is necessary to avoid disruption of either patients or health care operations. Although the *Beth Israel* Court recognized the "importance of the employer's interest in protecting patients from disturbance," 437 U.S. at 505, 98 S.Ct. at 2475, it placed the burden on the hospital to establish that its prohibition was necessary to preserve patient care. The Court found that the employer had not met its burden, concluding that "the possibility of any disruption in patient care resulting from solicitation or distribution of literature [in the hospital's cafeteria] is remote." *Id.* at 502, 98 S.Ct. at 2474 (quoting 222 NLRB at 151).[2] One year later, in *NLRB v. Baptist Hospital, Inc.*, 442 U.S. 773, 781, 99 S.Ct. 2598, 2603, 61 L.Ed.2d 251 (1979), the Court reviewed the validity of a Board order prohibiting a hospital from enforcing its rule against solicitation in any area of the hospital other than "immediate patient care areas." Applying the *Beth Israel* standard, the Court found the Board's prohibition overly broad as it applied to corridors and sitting rooms on patient floors because the hospital, through expert testimony, demonstrated the need to maintain a "tranquil atmosphere." 442 U.S. at 783, 99 S.Ct. at 2604. However, the Court approved the Board's order regard-

ing the cafeteria, gift shop, and lobbies on the first floor because the hospital "presented no clear evidence of the frequency with which patients use [these areas]." *Id.* at 786, 99 S.Ct. at 2605.

Applying *Beth Israel* and *Baptist Hospital*, the Board in this case concluded that Southern Maryland failed to show the required adverse impact on patient care. We agree. Unlike both *Baptist Hospital* and *Baylor University Medical Center v. NLRB*, 662 F.2d 56, 61 (D.C.Cir.1981), where the hospital submitted medical testimony regarding the impact on patient care, the only evidence submitted by Southern Maryland on this point concerned the number of patients and employees who pass through the front entrance every day. However, the fact that 41,000 patients used the main entrance in the 1984 calendar year shows at most that Southern Maryland is a big hospital; it does not explain how many patients arrive in the early morning or what impact the brief exposure to the distribution of literature would have on them as they arrived. It is doubtful that many patients would be inconvenienced at 6:30 a.m. by some leafletting at the front entrance, which cannot be termed a treating venue.[3] *See NLRB v. Harper–Grace Hospitals, Inc.*, 737 F.2d 576, 578 (6th Cir.1984) (hospital employees arrived at "approximately 6:30 a.m." at both the hospital's main and basement entrances and began passing out literature; court upholds Board's finding that no impact on patient care can be demonstrated).[4]

Nor can we find support for the hospital's argument that the employees had alternative locations for the distribution of union literature.[5] Although the *Beth Israel* Court indicated that the availability of alternative sites might be a consideration

---

2. The Court found that "patient use of the cafeteria [was] voluntary, random, and infrequent," and considered it of "critical significance that only 1.56% of the cafeteria's patrons are patients." *Id.* at 502, 98 S.Ct. at 2474.

3. The record shows that emergency room patients generally use the separate ER entrance.

4. The hospital attempts to distinguish *Harper–Grace* by noting that, in *Harper–Grace,* the hos-

pital's main entrance was the "exclusive entrance," whereas here the side entrance presented an alternative leafletting spot. To the contrary, in *Harper–Grace,* as here, employees were able to enter the hospital through a basement entrance. 737 F.2d at 578 n. 2.

5. The hospital argued both to the Board and to this court that the employees could have distributed literature at both the side and rear entrances and in the cafeteria.

when determining the validity of restrictions on employee solicitation in the health care context, *see* 437 U.S. at 505, 98 S.Ct. at 2475, we reject the respondent's view that such availability is determinative, as it is with respect to solicitation by nonemployees, *see infra*. Rather, we conclude that the possible availability of alternative areas for the distribution of union literature is of marginal importance when the employer has not demonstrated an impact on patient care. *See Beth Israel*, 437 U.S. at 505, 98 S.Ct. at 2475 (consideration of alternatives not proper where chosen spot of employees is "natural gathering are[a]" with minimal impact on patients). Accordingly, we enforce the Board's order regarding the distribution of union literature.

## B. *Access To The Cafeteria*

■ We next review the Board's holding that Southern Maryland violated the Act by refusing cafeteria access to a union organizer. Thirty-four years ago, in *NLRB v. Babcock & Wilcox Co.*, 351 U.S. 105, 113, 76 S.Ct. 679, 685, 100 L.Ed. 975 (1956), the Supreme Court established the standards governing situations where an employer's private property rights conflict with the rights of union organizers to contact potential members. The Court emphasized that the standard applicable to *non* employee access to an employer's property is quite different from that which applies when employees seek to organize. The Court noted that while "[n]o restriction may be placed on the employees' right to discuss self-organization among themselves, ... no such obligation is owed nonemployee organizers." 351 U.S. at 113, 76 S.Ct. at 685. Accordingly, the Court in *Babcock & Wilcox* held that

> an employer may validly post his property against nonemployee distribution of union literature if reasonable efforts by the union through other available channels of communication will enable it to reach the employees with its message and if the employer's notice or order does not discriminate against the union by allowing other distribution.

*Id.* at 112, 76 S.Ct. at 684.

Although *Babcock & Wilcox* involved distribution of union literature, the Court subsequently applied the *Babcock & Wilcox* standard to solicitation activity in *Central Hardware Co. v. NLRB*, 407 U.S. 539, 92 S.Ct. 2238, 33 L.Ed.2d 122 (1972). More recently, the Court has placed on the union the burden of proving inaccessibility and the ineffectiveness of alternate means of communication, declaring that:

> [t]o gain access [to an employer's property], the union has the burden of showing that no other reasonable means of communicating its organizational message exists or that the employer's access rules discriminate against the union's solicitation. That the burden imposed on the union is a heavy one is evidenced by the fact that the balance struck by the Board and courts under the *Babcock* accommodation principle has rarely been in favor of trespassory organizational activity.

*Sears Roebuck & Co. v. San Diego County District Council of Carpenters*, 436 U.S. 180, 205, 98 S.Ct. 1745, 1761, 56 L.Ed.2d 209 (1978) (footnotes omitted).

Here, the hospital's no-solicitation policy provided that "[p]ersons not employed by the Hospital may not solicit or distribute literature on Hospital property for any purpose at anytime." Under *Babcock & Wilcox* and *Sears Roebuck*, this policy is valid so long as the union organizers had alternative means of communicating with employees and so long as the hospital did not discriminate against the union by allowing other forms of solicitation at the cafeteria. *Cf. Hutzler Bros. Co. v. NLRB*, 630 F.2d 1012, 1017 (4th Cir.1980) ("[t]he ultimate question ... is not whether organizational contact of employees is difficult but whether the difficulty can be reasonably overcome"). In finding that the hospital violated the Act, the Board acknowledged that the Union had alternative methods of communication, but found that the no-solicitation policy was a mere "pretext" designed to selectively keep out the union representatives; the Board stated that "the hospital repeatedly and knowingly permitted employees' visitors and nonhospital employees to use the cafeteria."

The hospital raises two sources of error with regard to this holding: (1) the Board presented no evidence of discriminatory enforcement of the hospital's no-solicitation policy, and (2) the Board erred in not applying the *Babcock & Wilcox* balancing test to the hospital's conduct. We find both contentions persuasive.

In its brief, the Board argued that by allowing numerous friends and relatives of hospital employees into the cafeteria but keeping the union organizers out, the hospital discriminatorily enforced its "no-access rule." However, the policy here was a *no-solicitation* policy designed to keep out union representatives and other salesmen. Claims of disparate enforcement inherently require a finding that the employer treated similar conduct differently, *see Restaurant Corp. of America v. NLRB*, 827 F.2d 799, 807 (D.C.Cir.1987), and we see a difference between admitting employee relatives for meals and permitting outside entities to seek money or memberships. The Board presented no evidence that the hospital ever allowed salesmen to solicit sales of products to employees in the cafeteria. Nor was there evidence that groups, organizations or clubs were ever allowed to seek donations or solicit memberships in the cafeteria. Had the Board presented examples of this type of discriminatory enforcement, its decision might have possessed the substantial evidence needed to overcome the burden against impinging on the employer's private property rights.

Our conclusion is bolstered by reference to the different circumstances present in *Montgomery Ward & Co. v. NLRB*, 692 F.2d 1115 (7th Cir.1982), *cert. denied*, 461 U.S. 914, 103 S.Ct. 1892, 77 L.Ed.2d 282 (1983). There, the employer enacted a rule that banned solicitation by nonemployees on all company property at all times. In upholding the Board's finding that the employer discriminatorily enforced its no-solicitation rule, the court stated that this broad rule "was almost necessarily discriminatory." 692 F.2d at 122. The court also focused on the fact that the employer did not post its rule until the union began its organizational campaign and on the fact that other employees previously had solicited fellow employees in the cafeteria. *Id.* at 1123. *See also Midwest Stock Exchange, Inc. v. NLRB*, 635 F.2d 1255, 1270 (7th Cir.1980) (solicitation "regularly took place at the company, sometimes with the cooperation of supervisors"); *Rochester Gen'l Hospital*, 234 NLRB 253 (1978) (Board found no discriminatory application where hospital allowed Red Cross and pharmaceutical groups to solicit on hospital grounds).

In addition to the lack of substantial evidence supporting the Board's discrimination holding, we agree with respondent that the Board incorrectly utilized *Babcock & Wilcox*. Relying on *Ameron Automotive Centers*, 265 NLRB 511 (1982), and *Montgomery Ward & Co.*, 263 NLRB 233 (1982), *enf'd as modified*, 728 F.2d 389 (6th Cir. 1984) (per curiam), the Board noted that the key issue was not the balancing test outlined in *Babcock & Wilcox*, but rather whether the hospital excluded union representatives from a public cafeteria. That holding is consistent with the other Board decisions that have declined to apply the *Babcock & Wilcox* test in cases where nonemployee union organizers have sought access to a portion of an employer's property that is open to the public, such as a cafeteria.[6]

At least two circuits have rejected the applicability of *Ameron*, or at least rejected the inapplicability of *Babcock & Wilcox*, to situations like the one *sub judice*. *See Baptist Medical System v. NLRB*, 876 F.2d 661, 663 (8th Cir.1989); *Montgomery Ward & Co. v. NLRB*, 692 F.2d at 1124–25 ("*Babcock & Wilcox* must be an important starting point for analysis of any solicitation activity by nonemployees"). In *Baptist Medical System*, nonemployee union organizers went into a hospital cafeteria that, unlike the one at Southern Maryland, was open to the general public and proceed-

---

**6.** *See Ameron*, 265 NLRB at 512 ("the *Babcock & Wilcox* criteria need not be met, since nonemployees cannot in any event lawfully be barred from patronizing the restaurant as general members of the public"); *Hughes Properties, Inc.*, 267 NLRB 1167 (1983), *enf'd*, 758 F.2d 1320 (9th Cir.1985).

ed to solicit employees, in violation of the hospital's no-solicitation policy. Rejecting the Board's reliance on *Ameron*, the panel stated that focusing only on the public nature of the cafeteria "fail[s] to adequately take into account the general principles expressed in *Babcock*." 876 F.2d at 663. Rather, the court held that the *Babcock & Wilcox* balancing principle does not become inapplicable "because the nonemployees attempt to use an area that the employer has designated for public use." Applying *Babcock & Wilcox*, the court concluded that

> when an employer has chosen not to allow any solicitation or promotional activity by nonemployees in its public facility and union organizers attempt to use that facility for promotional or solicitation purposes, we believe that *Babcock* contemplates that such activity may validly be prohibited, even where the organizers' activity is not actually disruptive.

*Id.* at 664.

We find the approach of *Baptist Medical System*, with its proper balance between the rights of private employers and the organizational concerns of a union, persuasive. In the absence of any evidence suggesting discriminatory enforcement of the hospital's no-*solicitation* policy, combined with the fact that the union had alternative means of communicating with hospital employees, we conclude that Southern Maryland could prohibit solicitation in its cafeteria. Accordingly, we deny enforcement to this part of the Board's order.

## C. *Surveillance Of Union Activities*

▮ Southern Maryland next objects to the Board's finding that it unlawfully chilled the union representatives at the cafeteria and created a coercive environment. Consistent with our finding that the hospital could prohibit solicitation in its cafeteria, we hold that it could legally keep a close eye on the union representatives when they managed to gain entrance into the cafeteria. We therefore deny enforcement to that part of the Board's order.

It is firmly established that management officials may observe public union activity, particularly where such activity occurs on company premises, without violating § 8(a)(1) of the Act, unless such officials do something "out of the ordinary." *Metal Industries, Inc.*, 251 NLRB 1523 (1980). The test for determining whether an employer engages in unlawful surveillance, or unlawfully creates the impression of surveillance, is "an objective one and involves the determination of whether the employer's conduct, under the circumstances, was such as would tend to interfere with, restrain, or coerce employees in the exercise of their rights guaranteed under Section 7 of the Act." *The Broadway*, 267 NLRB 385, 400 (1983) (citing *United States Steel Corp. v. NLRB*, 682 F.2d 98 (3d Cir.1982)).

Applying that test, the Board has on several occasions found that employers unreasonably chilled the exercise of their employees' Section 7 rights through excessive surveillance. *See Arthur Briggs, Inc.*, 265 NLRB 299, 309 (1982) (unlawful surveillance because employer's representative went outside employer's property to observe union activity), *enf'd mem.*, 729 F.2d 1441 (2d Cir.1983); *Arrow Automotive Industries*, 258 NLRB 860, 861 (1981) (employer's surveillance of public handbilling was "deliberately calculated plan to show and demonstrate observation, in numbers and force, and its cause and effect was the surveillance of the employees"), *enf'd mem.*, 679 F.2d 875 (4th Cir.1982); *Montgomery Ward & Co.*, 256 NLRB 800, 812 (1981) (employer interfered with organizers during meeting and engaged in "unreasonably close" observation of organizers as they finished their lunches); *enf'd*, 692 F.2d 1115 (7th Cir.1982), *cert. denied*, 461 U.S. 914, 103 S.Ct. 1892, 77 L.Ed.2d 282 (1983). In all these cases, however, the union representatives possessed the Section 7 right to engage in the particular organizational activities. In *Arthur Briggs, Inc.*, for example, the union representatives were legally entitled to distribute handbills outside the employer's property, *see* 265 NLRB at 309; in *Arrow Automotive Industries*, the organizers had the right to handbill prospective members in the plant parking lot, *see* 258 NLRB at 863; and in *Montgomery Ward & Co.*, the nonemployee union orga-

nizers were lawfully, unlike the instant case, in the company's cafeteria when they solicited employees, *see* 256 NLRB at 812.

By contrast, the organizers at Southern Maryland were not, as we concluded *supra,* legally entitled to solicit members in the cafeteria. Having concluded that the employer can completely prohibit solicitation in the cafeteria, we must also hold that the same employer has the lesser right to conduct surveillance of union activities to determine if the rightly prohibited activity is taking place. Thus, in situations where the employer has the right to bar the union from a part of its premises, the degree of surveillance, no matter how "out of the ordinary," is irrelevant.

The Board has accepted the logic of this argument previously. In *Hoschton Garment Co.*, 279 NLRB 565 (1986), a union representative was engaged in handbilling at the front gate of the employer's facility, and the representative was trespassing while doing so. Although the employer's representative coerced and interfered with the union official as he distributed his handbills, the Board concluded that such close observation was not unlawful because the employer was entitled to exercise his legitimate proprietary prerogative, even if the conduct fell short of evicting the trespasser. "Inasmuch as the [employer] ultimately had a right to expel nonemployee union organizers from its property," concluded the Board, "it perforce had a right to stop short of expulsion and simply observe the handbilling activity on its premises." 279 NLRB at 567.

We agree that such reasoning applies in the instant case and so refuse to enforce the part of the Board's order that applies to employer surveillance.

### D. *Hospital Disciplinary Rules*

■ The final challenge to the Board's order concerns Rules 24 and 25 of the hospital's disciplinary policy. Rule 24 provides for a "3–day suspension with intent to terminate" in response to an "unauthorized presence on Hospital property." Applying the Board's decision in *Tri–County*

*Medical Center, Inc.*, 222 NLRB 1089 (1976), the Board, although recognizing that Rule 24 had never been enforced, concluded that it was overly broad and unreasonably restricted employee organizing rights.

The hospital maintains that Rule 24 is valid because it is "not inherently threatening or coercive," and is not aimed at union activity. Disciplinary rules such as this do not survive, however, merely because they do not induce a threatening or coercive atmosphere. In *Tri–County*, which still stands as the leading Board case on the access rights of off-duty employees, the Board set out the permissible limits of an employer's disciplinary procedures:

> [A disciplinary rule is not unlawful if it] (1) limits access solely with respect to the interior of the plant and other working areas; (2) is clearly disseminated to all employees; and (3) applies to off-duty employees seeking access to the plant for any purpose and not just to those employees engaging in union activity. Finally, except where justified by business reasons, a rule which denies off-duty employees entry to parking lots, gates, and other outside nonworking areas will be found invalid.

222 NLRB at 1089. The Board also noted that an employer's motive in adopting a no-access rule is not determinative of its legality. *Id.* at 1090.

We conclude that *Tri–County* represents a defensible construction of the Act, *see NLRB v. Pizza Crust Co. of Pennsylvania*, 862 F.2d 49, 55 (3d Cir.1988) ("the relevant issue is whether the employer established a policy or rule that was directly contrary to *Tri–County* "), and a review of the record convinces us that the Board reasonably found that Rule 24 was overbroad. Rule 24 is limited neither to nonemployees nor to the interior of the hospital. Thus, as the Board concluded, "off-duty employees had no assurance that their presence on the parking lots, at entrances or on other exterior portions of the hospital premises would automatically be regarded

as authorized." [7] *See also NLRB v. Ohio Masonic Home*, 892 F.2d 449, 453 (6th Cir. 1989) (no-access rule of retirement home which applied to entire premises was overbroad and invalid under *Tri-County* ).

■ Turning to Rule 25, this policy provides that "[m]alicious gossip or derogatory attacks on fellow employees, patients, physicians or Hospital representatives: First Offense, 3–day suspension with intent to terminate." The Board found such a rule overly broad "because it combines a lawful prohibition of 'malicious gossip' with an unlawful prohibition of 'derogatory attacks' on hospital representatives."

It is well established that, while employers may proscribe "deliberately or maliciously false" statements, employers may not proscribe and punish for publication of false or inaccurate statements. *Owens–Corning Fiberglas Corp. v. NLRB*, 407 F.2d 1357, 1366 (4th Cir.1969). In *Maryland Drydock Co. v. NLRB*, 183 F.2d 538, 539 (4th Cir.1950), we held that an employer was entitled to maintain discipline by prohibiting "defamatory and insulting statements which reasonably tend to destroy such discipline...." Sixteen years later, in *Linn v. United Plant Guards, Local 114*, 383 U.S. 53, 61, 63, 86 S.Ct. 657, 662, 663, 15 L.Ed.2d 582 (1966), the Supreme Court accorded significant protection to "intemperate, abusive and inaccurate statements [made] during attempts to organize employees.... [T]he most repulsive speech enjoys immunity provided it falls short of a deliberate or reckless untruth." Applying *Linn*, the Board has held that an employer may not prohibit "merely false" union propaganda, but may only ban statements made with knowledge of their falsity or with reckless disregard for the truth. *Radisson Muehlebach Hotel*, 273 NLRB 1464 (1985).

Relying on *Maryland Drydock*, the hospital maintains that the permission to prohibit "defamatory and insulting statements" applies to "derogatory" statements as well. We do not agree. Although certain types of derogatory remarks may sound quite similar to maliciously false and defamatory speech, which an employer may prohibit, derogatory remarks may also include truthful union propaganda that places hospital personnel in an unfavorable light. By permitting the punishment of employees for speaking badly about hospital personnel, the employer "fail[ed] to define the area of permissible conduct in a manner clear to employees and thus cause[d] employees to refrain from engaging in protected activities." *American Cast Iron Pipe Co. v. NLRB*, 600 F.2d 132, 137 (8th Cir.1979). It may very well be true that derogatory attacks destroy, as the hospital puts it, "the positive work atmosphere," but the values of free speech and union expression outweigh employer tranquility in this instance.

## IV.

To summarize, we grant enforcement with respect to the Board's findings on the distribution of union literature and the hospital's disciplinary rules. However, we deny enforcement with respect to the Board's finding that the hospital unlawfully excluded union representatives from soliciting in the cafeteria, and that the hospital unlawfully conducted a chilling surveillance on the union organizers in the cafeteria.

**ENFORCEMENT GRANTED IN PART AND DENIED IN PART.**

---

7. We also reject the view that the employer's rule is saved because it was never enforced. *See NLRB v. Beverage Air Co.*, 402 F.2d 411, 419 (4th Cir.1968) ("mere existence" of an overbroad but unenforced no-solicitation rule is unlawful because it "may chill the exercise of the employees' [section] 7 rights"); *Pizza Crust Co.*, 862 F.2d at 54 ("[n]othing in the *Tri-County* rule implies that the Act is violated only if the employer was successful in its barring of solicitation").